# Illinois Official Reports

## Appellate Court

---

### *People v. Carrasquillo*, 2020 IL App (1st) 180534

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONNIE CARRASQUILLO, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-18-0534 |
| Filed | March 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 76-CR-05807; the Hon. Alfredo Maldonado, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Michael E. Deutsch and Shubra Ohri, of People's Law Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Lampkin and Burke* concurred in the judgment and opinion. |

---

*Justice Burke was added to the panel after oral argument to replace Justice Reyes, and she has listened to the recording of oral argument.

## OPINION

¶ 1     After a bench trial before Cook County Circuit Court Judge Frank Wilson, defendant Ronnie Carrasquillo was convicted of the October 10, 1976, murder of Chicago police officer Terrence Loftus. On January 17, 1978, Judge Wilson sentenced defendant to an indeterminate sentence of 200 to 600 years with the Illinois Department of Corrections (IDOC).[1]

¶ 2     This appeal concerns the denial by a different trial judge of (1) defendant's petition pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2018)) after an evidentiary hearing and (2) defendant's motion for leave to file a successive postconviction petition.

¶ 3     In his section 2-1401 petition, defendant claims that his conviction and sentence are void because the judge who tried and sentenced him was corrupt. Defendant argues that the judge took a bribe in another case and then sought to deflect attention from the other case by rendering a harsh judgment and sentence in defendant's case. This type of theory is known as "compensatory bias." *E.g.*, *People v. Gacho*, 2016 IL App (1st) 133492, ¶ 21; see also *Bracy v. Gramley*, 520 U.S. 899, 905 (1997).[2]

¶ 4     In his motion for leave to file a successive postconviction petition, defendant claims that his sentence is a *de facto* life sentence imposed on an 18-year-old, first-time offender that violates both the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11) and the eighth amendment to the United States Constitution (U.S. Const., amend. VIII).

¶ 5     For the following reasons, we affirm the trial court's dismissal of his section 2-1401 petition but reverse the trial court's denial of his motion for leave to file his successive postconviction petition.

¶ 6                                 BACKGROUND

¶ 7     This court set forth the facts of this case in our order pursuant to Illinois Supreme Court Rule 23 (eff. July 1, 1975), affirming defendant's murder conviction and sentence. We incorporate that order by reference and repeat here only the facts needed to determine the issues before us. *People v. Carrasquillo*, No. 1-78-621 (1979) (unpublished order under Illinois Supreme Court Rule 23).

¶ 8     In sum, the State's evidence at trial established that, in the early morning hours of October 10, 1976, Edward Roman, who was a member of the Imperial Gangsters street gang, was being chased by members of the rival Gaylords gang when Officer Terrence Loftus, who was passing by in plain clothes and an unmarked vehicle, stopped Roman. The stop occurred at the intersection of Fullerton Avenue and Central Park Avenue in Chicago. Members of the Imperial Gangsters, including defendant, left a nearby party and converged on the intersection where a gang fight ensued. At trial, defendant testified in his own defense and admitted that he

---

[1]For an explanation of how to understand an indeterminate sentence, please see paragraph 22 of this opinion. See *infra* ¶ 22.

[2]Some courts have "pointed out that this theory is quite speculative; after all, it might be equally likely that a judge who was 'on the take' in *some* criminal cases would be careful to at least appear to favor *all* criminal defendants, so as to avoid apparently wild and unexplainable swings in decisions and judicial philosophy." (Emphases in original.) *Bracy*, 520 U.S. at 905.

was at the intersection, that he fired a gun between three and five times, and that he brought the gun to Francisco Gonzalez's home after the shooting. Witnesses testified that shots were fired from the south side of Fullerton Avenue and four cartridge casings[3] were recovered from that area. A firearms examiner testified that all four cartridge casings were fired from the .32-caliber pistol later found in Gonzalez's apartment. However, other bullet fragments found near the scene were not suitable for comparison. The assistant medical examiner, who performed the autopsy on Officer Loftus, testified that he observed one entry wound and one exit wound from one bullet, that Officer Loftus was shot in the head, and that these bullet wounds were the cause of death.[4]

¶ 9 On direct appeal, this court affirmed defendant's conviction and sentence, rejecting defendant's claims. Defendant claimed, first, that the State's evidence was insufficient to prove beyond a reasonable doubt that he had fired the shot that killed Officer Loftus. We rejected this claim, finding that "a review of the evidence at trial *** establishe[d] that defendant was the only one to fire shots at the time Officer Loftus was struck and killed." *Carrasquillo*, No. 1-78-621, slip order at 7. Further, we observed that, although bullet fragments found on the scene could not be traced directly to the .32-caliber gun that defendant fired, they were "consistent with the type of bullet" fired from a .32-caliber gun. *Carrasquillo*, No. 1-78-621, slip order at 7. In addition, Francisco Gonzalez testified that defendant told him that he thought he had shot a police officer. *Carrasquillo*, No. 1-78-621, slip order at 4.

¶ 10 Second, defendant claimed that there was insufficient evidence of intent to sustain a conviction for murder and that his conviction should be for involuntary manslaughter instead. Defendant relied on his own testimony that he was aiming up, at the second floor of the YMCA building located at the intersection, and on other testimony that there was a bullet hole in the second floor window of the YMCA and a bullet fragment found on the second floor. However, Officer Louis Bergmann, who arrived at the scene prior to the shooting, testified that he heard someone shout "Gangster Love" before four or five shots were fired in rapid succession from the south side of Fullerton Avenue and Officer Loftus crumpled to the ground. *Carrasquillo*, No. 1-78-621, slip order at 1. As noted above, the four shell casings recovered from the south side of Fullerton Avenue matched the gun that defendant fired. David Gonzalez,[5] who was at both the party and the intersection, testified that he observed defendant run to a parked vehicle, point the gun with both hands, and shoot the gun four times toward the crowd at the intersection. *Carrasquillo*, No. 1-78-621, slip order at 2. David Gonzalez testified that defendant was pointing the gun level, rather than pointing it up. *Carrasquillo*, No. 1-78-621, slip order at 2. Thus, we rejected defendant's claim that the evidence could sustain only a conviction for involuntary manslaughter.

---

[3]The trial court's order mistakenly stated that there were five cartridges, when there were four. *People v. Carrasquillo*, No. 76-CR-05807, slip op. at 7 (Cir. Ct. Cook County Jan. 24, 2018). The order stated that it was simply quoting our Rule 23 order regarding the facts, and it quoted our order as stating that " 'Officer James P. Frankenbach testified that *** he recovered 5 cartridges casings.' " However, our Rule 23 order stated: "Officer James P. Frankenbach testified that *** he recovered 4 cartridge casings." *Carrasquillo*, No. 1-78-621, slip order at 4.

[4]Our Rule 23 order mistakenly stated that "two bullets *** struck Officer Loftus." *Carrasquillo*, No. 1-78-621, slip order at 7. While the assistant medical examiner testified that there were two bullet wounds, those wounds were an entry wound and an exit wound from one bullet.

[5]There are two witnesses with the same last name of Gonzalez: David and Francisco.

¶ 11    Third, defendant claimed that his sentence was excessive in light of the fact that he had no prior record and was 18 years old at the time of the offense.[6] Rejecting this claim, we found: "Although defendant had not been convicted of any previous crime, his own testimony was that fights involving knives and guns were a frequent occurrence, and he had been involved in two such fights in the two weeks prior to the occurrence." *Carrasquillo*, No. 1-78-621, slip order at 9. In addition, we found that defendant was a member of a street gang. In conclusion, we found "that the sentence imposed of 200 to 600 years clearly suggests to the parole board that the trial judge did not believe defendant should be paroled after the minimum period of incarceration." *Carrasquillo*, No. 1-78-621, slip order at 9. We rejected all three claims and affirmed his conviction and sentence.

¶ 12    In 1987, defendant filed his first postconviction petition, which advanced to an evidentiary hearing. This first petition, which claimed ineffective assistance of counsel, was denied after the hearing, and we affirmed the denial on appeal. *People v. Carrasquillo*, No. 1-88-2139 (1990) (unpublished order under Illinois Supreme Court Rule 23).

¶ 13    On June 24, 2015, defendant filed a section 2-1401 petition, and on August 11, 2017, he filed a motion for leave to file a successive postconviction petition. As we noted above, his section 2-1401 petition claimed that his conviction and sentence were void because his original trial judge was corrupt, and his motion claimed that his sentence violated both the proportionate penalties clause and the eighth amendment. On January 7, 2016, the trial court[7] denied the State's motion to dismiss defendant's section 2-1401 petition and granted defendant's requests for discovery. On September 5, 2017, and October 31, 2017, an evidentiary hearing was held concerning the section 2-1401 petition. On January 24, 2018, the trial court denied defendant's section 2-1401 petition in a 47-page memorandum order, in which it made findings of fact.

¶ 14    The trial court found that the evidence at the hearing established that Judge Wilson accepted a bribe to acquit Harry Aleman, a defendant in a prior murder case and an alleged hit-man for " 'the Syndicate.' " *People v. Carrasquillo*, No. 76-CR-05807, slip op. at 11 (Cir. Ct. Cook County Jan. 24, 2018). We provide here a summary of those factual findings: In 1976, Aleman was indicted for the 1972 murder of Billy Logan, a Teamsters union steward and truck dispatcher. Robert Cooley, an attorney, approached Judge Wilson to offer a $10,000 bribe in exchange for an acquittal. After Wilson agreed, the Aleman case was transferred to Wilson, and Wilson found Aleman not guilty on May 24, 1977, after a bench trial. The acquittal drew a swift reaction in the press, with "every major newspaper in Chicago" running articles about "how the mob 'hit man' beat the charge." *Carrasquillo*, No. 76-CR-05807, slip op. at 17. In 1980, Wilson retired and later moved to Arizona. In 1986, almost a decade after the verdict in the case at bar, Cooley began cooperating with federal investigators in what came to be known as " 'Operation Greylord,' " an investigation of corrupt judges in Cook County. *Carrasquillo*, No. 76-CR-05807, slip op. at 18. Working with the Federal Bureau of Investigation (FBI),

<hr>

[6]The Rule 23 order mistakenly stated that defendant was 19 years old "at the time of the crime." *Carrasquillo*, No. 1-78-621, slip order at 9. However, 19 years was defendant's age at the time of the trial, not the offense. Defendant, who was born on May 4, 1958, was 18 years old on October 10, 1976, the day of the offense.

[7]From here on, we use the term "the trial court" to refer to the judge who held the evidentiary hearing and decided the section 2-1401 petition and the motion that are at issue before us, and we refer to Judge Wilson, who is the judge who convicted and sentenced defendant, by his name.

- 4 -

Cooley wore a wire while meeting Wilson for dinner in Arizona in May of 1989. In November 1989, FBI agents visited Wilson's Arizona home, disclosed that Cooley had worn a wire during the prior dinner, and asked Wilson if he would cooperate against Aleman. Wilson denied that he had accepted money and failed to appear a week later when summoned to appear before a grand jury in Chicago. On February 5, 1990, Wilson committed suicide with a self-inflicted gunshot wound.

¶ 15    At the evidentiary hearing on September 5, 2017, Glenn Seiden, defendant's attorney at the 1977 trial, testified that he had recommended a bench trial because the defense theory of the case was more legal than factual, in that the defense would argue that the evidence showed manslaughter, not murder. In his testimony, Seiden explained that since the courtroom was likely to be filled with police officers, a jury might feel the pressure more and reject the distinction between manslaughter and murder. Lastly, Seiden testified that Wilson had " 'a reputation for being honest.' " *Carrasquillo*, No. 76-CR-05807, slip op. at 20. With respect to the sentence, Seiden testified that defendant's sentence was the longest that he had observed in his experience.

¶ 16    Brad Thompson, an investigator working with defendant's attorneys, testified that he had searched for all the published appellate opinions concerning murder convictions and sentences imposed by Judge Wilson from 1970 to 1981 and found 40 cases. Only one defendant received a sentence as long as defendant: Ronald McClellan, who was sentenced to 200 to 600 years for the robbery and murder of a mail carrier. *Carrasquillo*, No. 76-CR-05807, slip op. at 22 (citing *People v. McClellan*, 62 Ill. App. 3d 590 (1978)).

¶ 17    Rob Warden, a Chicago newspaper reporter,[8] testified on October 31, 2017, about the media coverage of the Aleman acquittal. Warden testified that a number of columnists wrote that the verdict was flawed and that some published articles called for an inquiry and asked the voters to hold Judge Wilson accountable. The Cook County State's Attorney called a press conference to denounce the verdict.

¶ 18    In denying defendant's section 2-1401 petition, the trial court rejected defendant's claim of compensatory bias, finding that "the fact that a judge was bribed in one case does not, in itself, establish that he was not impartial in others." *Carrasquillo*, No. 76-CR-05807, slip op. at 31 (citing *Gacho*, 2016 IL App (1st) 133492, ¶ 20).[9] Defendant had argued that his case and Aleman's case were connected because both were high profile trials in the same year. The courtroom during defendant's trial was filled with uniformed officers. Defendant argued that defendant's trial offered Wilson a chance to rehabilitate himself and show that he was tough on crime by convicting and sentencing harshly a gang member who had allegedly killed a police officer.

¶ 19    The trial court rejected this argument, finding that defendant had "not made a legally sufficient showing of a nexus between his trial and Aleman's." *Carrasquillo*, No. 76-CR-05807, slip op. at 31. The trial court found that the prior bribe and the proximity in time were not, by themselves, sufficient to create a nexus. Defendant did not allege any trial errors or anything suspicious about Judge Wilson's conduct of the trial, except for the conviction and sentence. The trial court found that defendant had failed to show a connection, particularly

---

[8]Warden was a reporter with the Chicago Daily News from 1965 until it closed in 1978.

[9]*Gacho* was a split decision, with Justice Delort dissenting. See *Gacho*, 2016 IL App (1st) 133492, ¶¶ 37-51 (Delort, J., dissenting).

where Judge Wilson did not appoint the defense counsel, the trial was not rushed, and "nothing in the evidence that brought the Aleman bribe to light *** discussed any effect on or relation to any of Wilson's other cases." *Carrasquillo*, No. 76-CR-05807, slip op. at 33.

¶ 20    In addition, the trial court rejected defendant's argument that Judge Wilson had "a personal interest in the outcome" of defendant's trial—the personal interest being a need to deflect attention. *Carrasquillo*, No. 76-CR-05807, slip op. at 33. The trial court found that there was no evidence that Wilson was laboring under a need in December 1977 to deflect attention from an acquittal that had occurred seven months earlier. *Carrasquillo*, No. 76-CR-05807, slip op. at 35. In the case at bar, Judge Wilson found defendant guilty on Monday, December 19, 1977, seven months after he found Aleman not guilty on May 24, 1977, and Wilson sentenced defendant on Monday, January 17, 1978, eight months after the verdict in the Aleman trial.

¶ 21    The trial court also found that defendant had failed to prove actual bias, observing that defendant's evidence of actual bias were his claims that he was guilty only of manslaughter and that his sentence was excessive—both claims that we had already rejected on direct appeal. *Carrasquillo*, No. 76-CR-05807, slip op. at 38-39 (discussing the appellate court's Rule 23 order).

¶ 22    In its order denying defendant's section 2-1401 petition, the trial court also addressed defendant's claim that his sentence was excessive. The trial court observed that "[a]n indeterminate sentence *** sounds foreign" to our ears after "four decades of determinate sentencing." *Carrasquillo*, No. 76-CR-05807, slip op. at 43. The trial court noted that "the real effect of his sentence was that [defendant] would serve 20 years to life with eligibility for parole beginning at 20 years less time for good behavior credit, with a recommendation *** that he serve more than the minimum 20 years." The trial court explained how this works: "A person serving an indeterminate sentence is eligible for parole upon serving the minimum term or 20 years, *whichever is less*, less time for good behavior credit." *Carrasquillo*, No. 76-C-05807, slip op. at 43 (citing 730 ILCS 5/3-3-3(a)(1) (West 2016)).[10]

¶ 23    Finding that "there is no evidence Wilson solicited or accepted a bribe in any other case" and, thus, corruption did not permeate his judicial actions, the trial judge denied defendant's section 2-1401 petition.

¶ 24    On February 21, 2018, the trial court denied defendant's motion for leave to file a successive postconviction petition. Before the court issued its order, defendant supplemented his motion with the affidavit of Jorge Montes, who averred that he had been a member of the Prisoner Review Board for 16 years; that he was its chairman from 2004 until 2010; that, during his tenure, defendant's case was considered by the board on numerous occasions; that, "[d]espite his excellent prison record and his strong family and community support," defendant was repeatedly denied parole "because the victim *** was a Chicago Police Officer"; and that, in his opinion, "[t]here are several members of the Board, then and now, who will never vote for parole when the victim is a police officer."

---

[10]"[E]very person serving a term of imprisonment under the law in effect prior to the effective date of this amendatory Act of 1977 shall be eligible for parole when he or she has served: (1) the minimum term of an indeterminate sentence less time credit for good behavior, or 20 years less time credit for good behavior, whichever is less[.]" 730 ILCS 5/3-3-3(a)(1) (West 2016).

¶ 25    In its order denying defendant's motion, the trial court found that defendant had established cause for not including his current claim in his earlier petition, since the line of cases concerning the sentences of juveniles and young adults was decided long after defendant was sentenced.

¶ 26    However, the trial court found that defendant had failed to establish prejudice. Defendant argued that his sentence was a *de facto* life-without-parole sentence, even though he has been eligible and has been considered for parole numerous times. Defendant argued, based on the Montes affidavit, that his eligibility for parole is illusory because some parole board members will not vote to grant parole where the victim was a police officer. The trial court rejected his arguments, finding that defendant's sentence was not a *de facto* life sentence where he had been eligible for parole after 20 years and that any allegation that the parole board acted improperly was better adjudicated in a direct action against the board, such as in a writ of mandamus action in state court or a *habeas* petition in federal court.

¶ 27    On February 21, 2018, defendant filed two notices of appeal on the same day. One notice challenged the trial court's denial on January 24, 2018, of his section 2-1401 petition, and a second notice challenged the trial court's denial of his motion for leave to file a successive postconviction petition. On March 27, 2018, this court assigned the same appellate case number to both notices, and this appeal followed.

¶ 28                                    ANALYSIS
¶ 29                                I. Section 2-1401
¶ 30                              A. Standard of Review
¶ 31    Defendant's first claim on this appeal concerns the trial court's denial of his section 2-1401 petition. Section 2-1401 of the Code of Civil Procedure establishes a comprehensive statutory procedure for obtaining relief from final orders or judgments older than 30 days. *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 31; *People v. Vincent*, 226 Ill. 2d 1, 7 (2007); 735 ILCS 5/2-1401(a) (West 2018).[11] A petition must be filed in the same proceeding in which the order or judgment was entered, but the petition is not a continuation of the original proceeding. *Vincent*, 226 Ill. 2d at 7; 735 ILCS 5/2-1401(b) (West 2018). Instead, the petition marks the start of "an independent and separate action," which must be supported by an affidavit or other appropriate showing as to matters not already of record. *Warren*, 2015 IL 117783, ¶ 31; 735 ILCS 5/2-1401(b) (West 2018) ("The petition must be supported by affidavit or other appropriate showing as to matters not of record.").

¶ 32    Relief under section 2-1401 is predicated upon proof by a preponderance of the evidence of (1) a defense or claim that would have precluded entry of the judgment in the original action and (2) diligence in both discovering the defense or claim and presenting the petition. *Vincent*, 226 Ill. 2d at 7-8; see also *Warren*, 2015 IL 117783, ¶ 37 ("the quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence"). Although section 2-1401 is a civil remedy with "its roots in common law equity," it extends to criminal cases as well. *Vincent*, 226 Ill. 2d at 7-8.

---

[11]There have been numerous changes to section 2-1401 since defendant filed his petition in 2015. See 735 ILCS 5/2-1401 (West 2014). However, none of these changes—which concerned foreclosure proceedings, domestic violence, and cannabis convictions—affect defendant's claim. Thus, we cite in this opinion to the latest version of the statute.

¶ 33    Since section 2-1401 is a civil remedy, it is "subject to the usual rules of civil practice." *Vincent*, 226 Ill. 2d at 8. "Where a material issue of fact exists, summary judgment is inappropriate and an evidentiary hearing—a trial in effect—is required in ruling on the petition." *Vincent*, 226 Ill. 2d at 9. In the case at bar, the trial court determined that a material issue of fact existed, and an evidentiary hearing was held.

¶ 34    "[A] section 2-1401 petition can present either a factual or legal challenge to a final judgment or order." *Warren*, 2015 IL 117783, ¶ 31. "[T]he nature of the challenge presented in a section 2-1401 petition is critical because it dictates the proper standard of review on appeal." *Warren*, 2015 IL 117783, ¶ 31.

¶ 35    Our supreme "court has held that a section 2-1401 petition seeking to vacate a void judgment, a purely legal issue, does not need to establish a meritorious defense or satisfy due diligence requirements." *Warren*, 2015 IL 117783, ¶ 48. The court found that this exception applied only to "a specific niche of section 2-1401 petitions, those presenting a purely legal claim challenging a final judgment or order as void." *Warren*, 2015 IL 117783, ¶ 49. For this niche of petitions, the standard of review is *de novo*. *Warren*, 2015 IL 117783, ¶¶ 46-47.[12] "Under the *de novo* standard, the reviewing court performs the same analysis that the trial court would perform." *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 36    "In stark contrast ***, a section 2-1401 petition that raises a fact-dependent challenge to a final judgment or order must be resolved by considering the particular facts, circumstances, and equities of the underlying case." *Warren*, 2015 IL 117783, ¶ 50. When a section 2-1401 petition presents a fact-dependent challenge to a final judgment or order, it must set forth specific factual allegations, showing (1) the existence of a meritorious defense and (2) due diligence in presenting the defense and filing the petition. *Warren*, 2015 IL 117783, ¶ 51. While the quantum of proof necessary to sustain the action is a preponderance, the trial court's ultimate decision on the petition is reviewed only for an abuse of discretion. *Warren*, 2015 IL 117783, ¶ 51. "[T]he trial court may also consider equitable considerations to relax the applicable due diligence standards ***." *Warren*, 2015 IL 117783, ¶ 51.

¶ 37    In the case at bar, defendant argues that his sentence and conviction are void due to extrinsic fraud perpetuated by Judge Wilson due to his personal interest in the outcome of defendant's case. Whether defendant frames the legal issue as either "extrinsic fraud" or the judge's "personal interest in the outcome," the alleged fraud or interest is still the judge's alleged compensatory bias. What the likelihood is that the judge was actually and subjectively motivated by compensatory bias when he convicted and sentenced defendant is a purely factual question, and there was no direct evidence presented. Since the judge has died, the judge's state of mind is a factual issue that a factfinder must determine from inferences from the circumstantial evidence. See, *e.g.*, *In re Donald R.*, 343 Ill. App. 3d 237, 246 (2003) (inferring the existence of a requisite state of mind from circumstantial evidence is typically the job of a factfinder). For this purely factual determination, our standard of review is abuse of discretion.

¶ 38    A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or when no reasonable person could take the view adopted by the trial court. *People v. Donoho*,

_____

[12] In *Warren*, a unanimous supreme court expressly limited the reach of *Vincent*, which had previously applied a *de novo* standard of review to a section 2-1401 petition. *Warren*, 2015 IL 117783, ¶¶ 46-47.

204 Ill. 2d 159, 182 (2003); *People v. Beverly*, 364 Ill. App. 3d 361, 367 (2006).

¶ 39                                    B. Two-Year Limit

¶ 40    Before considering whether the trial court abused its discretion in deciding the facts of defendant's claim, we must consider whether his section 2-1401 petition is time-barred.

¶ 41    A section 2-1401 petition must be filed "after 30 days from the entry" of the judgment attacked, which defendant's petition certainly was. 735 ILCS 5/2-1401(a) (West 2018). However, a section 2-1401 petition must also be filed "not later than 2 years after the entry of the order or judgment," which his petition certainly was not. 735 ILCS 5/2-1401(c) (West 2018); *People v. Abdullah*, 2019 IL 123492, ¶ 13.

¶ 42    Section 2-1401 provides that "[n]othing" contained within it "affects any existing right to relief from a void order or judgment." See 735 ILCS 5/2-1401(f) (West 2018). In the case at bar, defendant seeks to escape the two-year limit by asserting that his conviction and sentence were void from its entry due to extrinsic fraud.

¶ 43    Our supreme court "recognizes an exception to the ordinary two-year deadline when the petition challenges a void judgment." *People v. Thompson*, 2015 IL 118151, ¶ 29; *Abdullah*, 2019 IL 123492, ¶ 13. However, this exemption "from the ordinary procedural bars is available only for specific types of claims." *Thompson*, 2015 IL 118151, ¶ 31; *Abdullah*, 2019 IL 123492, ¶ 13. Whether defendant's claim qualifies as one of these specific types of claims "presents a question of law that we review *de novo*." *Thompson*, 2015 IL 118151, ¶ 25; *Abdullah*, 2019 IL 123492, ¶ 13.

¶ 44    The first type of claim recognized by the supreme court in *Thompson* is a claim that the judgment was "void because the court that entered the final judgment lacked personal or subject matter jurisdiction." *Thompson*, 2015 IL 118151, ¶ 31; *Abdullah*, 2019 IL 123492, ¶ 13. Subject matter jurisdiction refers to a court's power to hear and determine cases of the general class to which the proceeding in question belongs. *People v. Castleberry*, 2015 IL 116916, ¶ 12. Personal jurisdiction refers to the court's power to bring a person into its adjudicative process. *Castleberry*, 2015 IL 116916, ¶ 12. In the case at bar, the trial court had subject matter jurisdiction over the criminal offense and personal jurisdiction over defendant.

¶ 45    Next, the *Thompson* court observed that "[a] second type of voidness challenge" that may be raised at any time is "a challenge to a final judgment based on a facially unconstitutional statute that is void *ab initio*." *Thompson*, 2015 IL 118151, ¶ 32; *Abdullah*, 2019 IL 123492, ¶ 13. However, "the void *ab initio* doctrine does *not* apply to an as-applied constitutional challenge." (Emphasis in original.) *Thompson*, 2015 IL 118151, ¶ 32. In the case at bar, defendant does not raise claims about an unconstitutional statute.

¶ 46    "A third type of voidness challenge" that was previously recognized by the supreme court was "a challenge to a sentence that does not conform to the applicable sentencing statute." *Thompson*, 2015 IL 118151, ¶ 33. Since the supreme court abolished the void sentence rule in *Castleberry*, 2015 IL 116916, ¶ 19, "that type of challenge is no longer valid." *Thompson*, 2015 IL 118151, ¶ 33.

¶ 47    Although the *Thompson* defendant's claim did not fit within one of the two recognized types of exceptions, he argued, as does defendant in the case at bar, that the supreme court recognizes "that a sentence that violates the constitution is void and subject to challenge at any time." *Thompson*, 2015 IL 118151, ¶ 40. However, our supreme court rejected this argument

in *Thompson*, stating "we do not find our general statements on voidness in those decisions to be controlling on the narrow issue presented in this appeal." *Thompson*, 2015 IL 118151, ¶ 40. Although the *Thompson* defendant's claim involved an allegedly void sentence, our supreme court still found that it was procedurally barred. *Thompson*, 2015 IL 118151, ¶ 40.

¶ 48    Thus, alleging that a judgment is void is not the end of the inquiry but the beginning. As *Thompson* establishes, not all allegedly void judgments are excused from section 2-1401's procedural requirements; only certain types are. See *Thompson*, 2015 IL 118151, ¶ 40. The type of voidness challenge alleged by defendant is not one of the two types recognized by our supreme court as bypassing section 2-1401's procedural requirements.

¶ 49    Defendant argues that "a biased judge is a structural defect" and cites in support a different case, also named *Thompson*: *People v. Thompson*, 238 Ill. 2d 598, 609 (2010). In that case, our supreme court observed that there were certain errors, deemed "structural" errors, that required automatic reversal of a criminal conviction: (1) a complete denial of counsel, (2) a trial before a biased judge, (3) racial discrimination in the selection of a grand jury, (4) the denial of self-representation at trial, (5) the denial of a public trial, and (6) a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609. Defendant does not cite a case where our supreme court found that a structural error was yet a third type of voidness challenge that bypassed section 2-1401's procedural requirements, nor can we find any.

¶ 50    However, we need not rest our affirmance on this ground alone since we find, as we discuss below, that the trial court did not abuse its discretion in finding, as a factual matter, that there was a lack of evidence of compensatory bias in this case.

¶ 51                                    C. Extrinsic Fraud

¶ 52    A judgment entered by a court, otherwise exercising proper jurisdiction, is open to collateral attack where fraud existed in its procurement. *Doctor's Associates, Inc. v. Duree*, 319 Ill. App. 3d 1032, 1043 (2001). Only fraud that is extrinsic, as opposed to intrinsic, will render a judgment unenforceable. *Doctor's Associates*, 319 Ill. App. 3d at 1043. Extrinsic fraud is said to prevent the court from acquiring true jurisdiction or merely gives it colorable jurisdiction over the matter. *Doctor's Associates*, 319 Ill. App. 3d at 1043; see also *Taylor v. Bayview Loan Servicing, LLC*, 2019 IL App (1st) 172652, ¶ 15. It is conduct that is collateral to the issues in the case and prevents the unsuccessful party from having a fair opportunity to participate and defend in the action. *Doctor's Associates*, 319 Ill. App. 3d at 1043. By contrast, intrinsic fraud is fraud that occurs after the court acquires jurisdiction, such as false testimony, and goes to the merits of the case. *Doctor's Associates*, 319 Ill. App. 3d at 1043; see also *Taylor*, 2019 IL App (1st) 172652, ¶ 15. The party attacking the judgment on the ground of extrinsic fraud carries the burden of supporting his claim with adequate evidentiary support; thus, it is a factual determination given deference on review. *Doctor's Associates*, 319 Ill. App. 3d at 1043.

¶ 53    Our supreme court has repeatedly found that the "mere fact" that a judge was "implicated in accepting bribes in other nonrelated cases" does not "serve to taint all other decisions with which" that judge was involved. *People v. Fair*, 193 Ill. 2d 256, 261 (2000) (citing *People v. Titone*, 151 Ill. 2d 19, 29 (1992)). In *Fair*, for example, our supreme court found that the trial judge who presided over defendant's trial and sentencing had "engaged in extensive criminal conduct while on the bench," eventually pleading guilty to 159 separate crimes. *Fair*, 193 Ill. 2d at 259. On appeal, defendant argued that, since the trial court's corruption was pervasive,

there was no basis for presuming he was impartial at defendant's trial. *Fair*, 193 Ill. 2d at 260. Although our supreme court found the judge's corruption extensive, it "disagree[d]" and did not find this argument persuasive. *Fair*, 193 Ill. 2d at 260. Thus, the fact, by itself, that a judge took a bribe in another case does not render a defendant's conviction invalid. See *Gacho*, 2016 IL App (1st) 133492, ¶ 20 ("The fact that [a codefendant] bribed [the trial judge] does not in and of itself establish [the judge's] lack of impartiality in the defendant's trial.").

¶ 54        In *Titone*, 151 Ill. 2d at 30, our supreme court found that a defendant alleging compensatory bias had to establish (1) "a nexus between the activities being investigated and the trial judge's conduct at trial" and (2) "actual bias resulting from the trial judge's extrajudicial conduct."

¶ 55        After *Titone*, our supreme court in *People v. Hawkins*, 181 Ill. 2d 41, 50 (1998), observed that "[f]airness at trial requires not only the absence of actual bias but also the absence of the probability of bias. [Citation.] To this end, no person is permitted to judge cases in which he or she has an interest in the outcome." Based on *Hawkins* and the cases *Hawkins* cites, defendant in our case argues that he does not have to show "actual bias," as stated in *Titone*, 151 Ill. 2d at 30, but only "the probability of bias," as stated in *Hawkins*, 181 Ill. 2d at 50.

¶ 56        However, in *Fair*, our supreme court explained: "*Hawkins* simply clarified the second prong of the test by adding that a [defendant] need not prove actual bias if he can prove that the trial judge had a personal interest in the outcome of the trial." *Fair*, 193 Ill. 2d at 263. The *Fair* court "reaffirm[ed]" its "holding in *Titone* that in order to secure relief on a claim of judicial bias, [a defendant] must establish a nexus between a judge's corruption and the judge's conduct at [the defendant's] trial." *Fair*, 193 Ill. 2d at 263.

¶ 57        Thus, in the case at bar, defendant had the burden of establishing before the trial court (1) a nexus between Judge Wilson's bribe and Judge Wilson's conduct at defendant's trial and (2) actual bias by Judge Wilson or that he had a personal interest in the outcome of the case. See *Gacho*, 2016 IL App (1st) 133492, ¶ 21 (defendant must establish a nexus and either actual bias or "a direct, personal, and substantial" interest, such as "a pecuniary interest in the outcome").

¶ 58        Defendant argues that *Fair* and *Gacho* are distinguishable because they involved a jury verdict rather than a bench trial. See *Fair*, 193 Ill. 2d at 259 (jury trial); *Gacho*, 2016 IL App (1st) 133492, ¶ 2 ("the defendant elect[ed] a jury trial"). However, both *Titone* and *Hawkins* involved bench trials, as defendant's case did. See *Titone*, 151 Ill. 2d at 23 ("[d]efendant waived his right to a jury trial and received a bench trial"); *Hawkins*, 181 Ill. 2d at 45 n.1 (citing *People v. Fields*, 135 Ill. 2d 18, 27-28 (1990) ("[f]ollowing a bench trial," Hawkins was convicted)). Thus, we cannot find this argument persuasive.

¶ 59                                                    D. Nexus

¶ 60        We cannot find that the trial court abused its discretion in finding no nexus between Judge Wilson's acceptance of a bribe in an unrelated case and his conduct in defendant's trial and sentencing.

¶ 61        Defendant argues that the proximity in time between the bribe and defendant's trial and the suspicions aroused by accepting a bribe establish the nexus. However, as we discussed above, the acceptance of a bribe, by itself, does not establish compensatory bias in another case; this case was not "sandwiched tightly" between bribed cases, but occurred seven months after the only known bribery case by Judge Wilson. See *Fair*, 193 Ill. 2d at 265.

¶ 62    In *Fair*, 193 Ill. 2d at 265-66, our supreme court discussed *Bracy*, 520 U.S. 899, stressing the facts in *Bracy* that led the United States Supreme Court to conclude that further discovery in that case was warranted. See *Bracy*, 520 U.S. at 908. In *Bracy*, the defendant had alleged that his trial judge had a personal interest in his conviction because his speedy conviction would deflect suspicion from the fact that the trial judge was taking bribes in other murder cases. *Bracy*, 520 U.S. at 901. Our supreme court observed that supporting the *Bracy* defendant's claim were the facts that his murder trial was "sandwiched tightly" between other murder trials in which the judge had accepted bribes, that the judge appointed a former associate from his former private practice to represent defendant, that this attorney announced he was ready for trial only a few weeks after his appointment, and that he did not seek additional time to prepare for the penalty phase of the trial, even after the State announced its decision to seek the death penalty. *Fair*, 193 Ill. 2d at 265-66 (discussing *Bracy*, 520 U.S. at 906-08).[13] These "procedural irregularities" were the facts that warranted further discovery. *Fair*, 193 Ill. 2d at 266.

¶ 63    However, none of these facts occurred in the case at bar. Defendant's case was not sandwiched tightly between other bribery cases but rather occurred seven months after Judge Wilson's only known bribery case. Judge Wilson did not appoint defendant's trial counsel. The trial was not rushed, and defendant has not alleged any specific trial errors or procedural irregularities. See *Fair*, 193 Ill. 2d at 265-66 (discussing "procedural irregularities"); *Gacho*, 2016 IL App (1st) 133492, ¶ 24 (defendant's claim of compensatory bias failed where he could not identify one questionable ruling during trial); *Carrasquillo*, No. 76-CR-05807, slip op. at 33 (Wilson did not appoint trial counsel "[n]or does it appear the trial was rushed in any way").

¶ 64    In addition, the trial court in the case at bar found that, unlike the judges in *Fair* and *Bracy*, "there is no evidence Wilson solicited or accepted a bribe in any other case" and, thus, corruption did not permeate his judicial actions. By contrast, the trial judge in *Fair* had "engaged in extensive criminal conduct while on the bench *** both before and after [the defendant's] trial and sentencing" (*Fair*, 193 Ill. 2d at 259), and the trial judge in *Bracy* "fixed serious felony cases regularly," including cases that defendant's trial "was sandwiched tightly between" (*Bracy*, 520 U.S. at 906-07).

¶ 65    The trial court also found that defendant failed to establish that, at the time of defendant's trial and sentence, Judge Wilson was laboring under a need to engage in compensatory action, either to deflect an investigation or avoid backlash in an election. The trial court observed that Operation Greylord did not begin until three years later, and defendant did not present any "evidence that any law enforcement authority was investigating Wilson in December 1977," when defendant was convicted, or at "anytime, for that matter," until over a decade later when the FBI arranged for Cooley to meet with Wilson. *Carrasquillo*, No. 76-CR-05807, slip op. at 34. Although there had been newspaper articles calling upon voters to " 'cast him out,' " defendant did not present evidence that Wilson ever appeared on a ballot again or even intended to run again at any time after this trial. *Carrasquillo*, No. 76-CR-05807, slip op. at 34. By the time of defendant's trial, Aleman was indicted on federal charges, with "no investigation of Wilson" occurring. *Carrasquillo*, No. 76-CR-05807, slip op. at 34. Thus, the

---

[13]Although the words "sandwiched tightly" are a direct quote from *Bracy*, *Fair* did not quote them. See *Bracy*, 520 U.S. at 907 (defendant's "murder trial was sandwiched tightly between other murder trials that [the judge] fixed").

trial court did not abuse its discretion in finding that defendant failed to establish that Wilson would feel a need to engage in compensatory action at the time of his trial and sentencing, due to either a pending investigation or election.

¶ 66    In addition, the trial court found that Wilson was not laboring, at the time of his trial and sentencing, under a need to deflect media scrutiny about a possible bribe. The latest news article offered by defendant was from early June 1977. *Carrasquillo*, No. 76-CR-05807, slip op. at 42. While Wilson received intense media scrutiny in late May and early June 1977 from the Aleman acquittal, defendant failed to show that this scrutiny continued to December 1977, when defendant was convicted. Both the timing of the articles presented by defendant and their content are problematic for defendant's claim. The trial court found that, while there were articles criticizing Wilson's decision in the Aleman case, they did "not uniformly attack Wilson or insinuate impropriety on his part." *Carrasquillo*, No. 76-CR-05807, slip op. at 40. Some of the articles suggested that the mob threatened Wilson in connection with the Aleman case, which "would have helped mask the bribe." *Carrasquillo*, No. 76-CR-05807, slip op. at 40. Thus, the trial court did not abuse its discretion in finding that the timing and content of the media coverage did not establish that Wilson had a need in December 1977 to deflect media scrutiny away from the bribe in order to protect his reputation.

¶ 67    We cannot say that the trial court's ruling was arbitrary, fanciful, or unreasonable or that no reasonable judge could take the view adopted by the trial court. See *Donoho*, 204 Ill. 2d at 182.

¶ 68    Defendant emphasizes the conspicuous presence of uniformed police in the courtroom and argues that their presence would affect a judge who knew he had taken a bribe in an earlier case. First, the presence of uniformed police officers in a courtroom has been found to be not "inherently prejudicial," even in a jury trial. *People v. Peeples*, 205 Ill. 2d 480, 529 (2002). Second, the risk of prejudice is generally presumed to be less in a bench trial and is the reason that trial counsel gave for selecting a bench trial. See *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26 ("the risk of prejudice is less"). Third, decisions regarding the propriety of uniformed police officers in the courtroom are generally left to the discretion of the trial judge. *Peeples*, 205 Ill. 2d at 531. Fourth, defendant raised this issue in his posttrial motion for a new trial, and Judge Wilson addressed it, stating

> "as I understand your argument you indicate the court could be influenced by the number of policemen in the court room. Let me tell you this for the record, I have been sitting in this same court room on the same bench for almost 11 years. This court room is open to all citizens, and numerous, numerous times we have standing room only in certain types [of] cases where it does cause some interest. Over all those 11 years there has been predominantly defense people sitting in the court room the majority of times. Not once has it ever influenced this court after 11 years."

In light of these considerations, we cannot find that no rational person would take the view that the trial court did.

¶ 69    Defendant argues that Wilson's announcement of the verdict and sentence without explanation indicates his bias. The argument seems to be that Wilson had no legitimate explanation for his actions. After listening to the closing arguments of the attorneys, the trial court did rule simply: "The defendant is found guilty of murder as charged." However, before imposing sentence, Wilson acknowledged that he had considered "the nature and circumstances of the offense and the history and character of the defendant" and had read the

presentence report. Wilson then explained: "The evidence was overwhelming. Even by the defendant's own witnesses, the defendant rested his elbows on the automobile, took careful aim, and appeared to be a pretty good shot because he shot and he murdered Terrence Loftus." Defendant has not cited any statutory or case authority to indicate that a trial judge at the time was required or expected to offer more explanation, and he has not cited any evidence to indicate that Wilson, in particular, had a routine practice or habit of offering more. Thus, we do not find Wilson's one-line pronouncement of verdict to be indicative of bias.

¶ 70     In his reply brief to this court, defendant states that he "does not assert that [Wilson's] particular rulings in the case showed some sort of judicial bias." Defendant states that his "claim is one of a structural defect which requires that a finding of guilty and sentence to be vacated regardless of the evidence."

¶ 71     Defendant cites the testimony at the evidentiary hearing of his own trial counsel who believed that Judge Wilson had formed an opinion as to the outcome of the case before the case was over. However, this was more likely to do with the evidence presented at trial, which we discuss in the section below, than with a bribe in an unrelated case months earlier.

¶ 72     In sum, considering the lack of proximity to the bribe, the lack of evidence of negative media attention from the bribe at the time of defendant's verdict and sentencing, the lack of an impending investigation or election, the lack of alleged improper conduct or remarks during defendant's trial and sentencing, and the lack of evidence of a pervasive atmosphere of corruption surrounding this judge, we cannot find that the trial court abused its discretion in finding no nexus between the bribe and the outcome in defendant's case seven months later. Again, we cannot say that the trial court's ruling was arbitrary, fanciful, or unreasonable or that no reasonable judge could take the view adopted by the trial court. See *Donoho*, 204 Ill. 2d at 182.

¶ 73                              E. Bias and Personal Interest
¶ 74     In addition to nexus, defendant must show bias or personal interest. *Supra* ¶ 56.
¶ 75     Defendant's argument that Wilson had a personal interest in the outcome of the case is essentially the same as his argument for why there was a nexus to the bribe—namely, that Wilson had a need to compensate for the bribe at the time of defendant's verdict and sentencing. We already discussed above why we found that the trial court did not abuse its discretion in making its finding on this issue, and there is no need to state it again.

¶ 76     Defendant's argument about bias is that the verdict and sentence cannot be understood without it. For the following reasons, we do not find that the trial court abused its discretion in finding this argument unpersuasive.

¶ 77     However, before we discuss this argument, we observe that the State argues that defendant needs to show evidence of actual bias, whereas defendant argues that he needs to show simply a probability of bias. As we already explained above (*supra* ¶¶ 54-56), our precedent requires a showing of actual bias as opposed to a probability of bias. However, the outcome here would be the same, either way. The standard on a section 2-1401 petition is only a preponderance of evidence (*Warren*, 2015 IL 117783, ¶ 51), which may explain why defendant chose this vehicle, despite its procedural hurdles. Whether defendant has to show a preponderance of actual bias or a probability of bias, our finding below would be exactly the same.

¶ 78    As this court already found on direct appeal, there is ample evidence to support the verdict of murder, as opposed to manslaughter, without resorting to an explanation of bias. Defendant argues that if we knew then what we know now, we would have made a different finding. On direct appeal, we found the evidence sufficient to support "the inference that defendant intended to kill or cause great bodily harm to some individual," and we continue to find that conclusion as persuasive as the day when we first made it. See *Carrasquillo*, No. 1-78-621, slip order at 7-8.

¶ 79    The evidence at trial established that a gang member, armed with a gun, went to the scene of a gang fight, where a police officer had stopped a rival gang member as he was being chased. At trial, defendant took the stand in his own defense and admitted that he, in fact, went to the fight armed with a gun, leaned against a parked vehicle, held the gun with two hands, fired the gun between three and five times, and later transported the gun to Francisco Gonzalez's home. Officer Bergmann testified that he heard someone shout "Gangster Love" and heard four or five shots fired in rapid succession from the south side of Fullerton Avenue. Bergmann then observed a man apparently hit by a bullet, who Bergmann later identified as the victim, Officer Loftus. Four cartridge casings were recovered from the curb on the south side of Fullerton Avenue, from where the shots were fired, and a firearms examiner testified that all four cartridge casings were fired from the .32-caliber pistol that defendant fired and which was later recovered from Francisco Gonzalez's apartment.

¶ 80    To argue lack of intent to kill or cause great bodily inquiry, defendant notes that he testified at trial that he pointed his gun up at the second floor of the abandoned YMCA building located at the intersection. Also evidence established that there was a bullet hole in the second floor window of the YMCA and that a bullet fragment was found on the second floor.

¶ 81    However, David Gonzalez, a member of the same gang as defendant, testified that defendant aimed the gun with both hands and pointed the gun level rather than up. Edward Roman, the rival gang member who was chased and then stopped by Loftus, testified that as Officer Loftus was holding him by his left wrist, shots were fired from the south side of Fullerton Avenue and the officer collapsed. Roman did not observe anyone else with a gun on the street. Even defendant testified that, while he was shooting his own gun, he did not hear any other gunshots. He testified, "all I heard was my own gun." Defendant did not hear other gunshots until later that night, when he was at Francisco Gonzalez's house. Defendant also testified that he did not hear any other gunshots between the time he left the party and the time he fired his gun.

¶ 82    From all these facts, we find ample evidence from which Judge Wilson could have, and did, conclude that defendant fired the shot that struck and killed Officer Loftus and that he did so with an intent to kill or cause great bodily injury. Defendant argues that David Gonzalez was the only person to contradict defendant's trial testimony that defendant was pointing his gun up. However, if defendant was the only active shooter at the scene when Officer Loftus, who was standing on the street, was shot, then defendant's gun could not have been aimed solely up at the second floor of the abandoned YMCA. Thus, all the evidence that establishes that defendant shot Loftus also establishes that his gun was pointing level, at Loftus. Under either an abuse-of-discretion standard of review or a *de novo* standard of review, we would make the same finding—that the evidence at trial sufficiently established that defendant was guilty of murder.

¶ 83 Defendant argues that his harsh sentence is also evidence of bias. In support of this claim, Brad Thompson, a defense investigator testified that among the 40 published appellate opinions concerning murder sentences imposed by Judge Wilson between 1970 to 1981, only one defendant received a sentence as long as defendant: Ronald McClellan, who was sentenced to 200 to 600 years for the robbery and murder of a mail carrier. *Carrasquillo*, No. 76-CR-05807, slip op. at 22 (citing *McClellan*, 62 Ill. App. 3d 590). However, there is no evidence in the record as to the facts or sentences for the other, unpublished cases. In addition, there is no evidence as to the sentencing in murder cases from the other criminal judges at the time.

¶ 84 The sentence issue presents a much closer question. On the one hand, from the evidence presented at the hearing, defendant's sentence was one of only two of the harshest sentences meted out by Wilson in over a decade, and it occurred during the same year in which he accepted a bribe and during a case with a large uniformed police presence. On the other hand, defendant's and McClellan's sentences are consistent, in that the victims in both cases were both government employees performing public functions when they were murdered. Although Officer Loftus was not in uniform or in a marked vehicle, there was evidence that defendant knew Officer Loftus was a police officer. Francisco Gonzalez testified that defendant told him that defendant thought he had shot a police officer. Under a *de novo* standard, we might find differently, but we cannot say that no rational person would take the view taken by the trial court in denying defendant's section 2-1401 petition. See *Donoho*, 204 Ill. 2d at 182; *Beverly*, 364 Ill. App. 3d at 367.

¶ 85 In sum, we cannot find that no rational person would conclude, as the trial court did, that the conviction and sentence, by themselves, are evidence of bias.

## II. Motion for Leave

¶ 86 Defendant also appeals the trial court's order on February 21, 2018, which denied his motion for leave to file a successive postconviction petition. Defendant claims that his sentence was a *de facto* life-without-parole sentence, imposed for a crime committed when he was 18 years old, and that it violates both the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of our state constitution (Ill. Const. 1970, art. I, § 11). The trial court rejected defendant's claim on the ground that it was not a *de facto* life-without-parole sentence.

### A. Constitutional Provisions and *Buffer*

¶ 88 "The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.' " *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). "That right," the United States Supreme Court has explained, " 'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned" ' to both the offender and the offense." *Miller*, 567 U.S. at 469 (quoting *Roper*, 543 U.S. at 560, quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)). "The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "And we view that concept less through a historical prism than according to ' "the evolving standards of decency that mark the progress of a maturing society." ' " *Miller*, 567 U.S. at 469-70 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976), quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (opinion of Warren, C.J., joined by Black, Douglas, and Whittaker, JJ.)).

¶ 89 Like the eighth amendment, the proportionate penalties clause of the Illinois Constitution embodies our evolving standard of decency. See *People v. Miller*, 202 Ill. 2d 328, 339 (2002) ("as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionality clause and the eighth amendment). Specifically, the proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The purpose of the proportionate penalties clause is to add a limitation on penalties beyond those provided by the eighth amendment and to add the objective of restoring the offender to useful citizenship. *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition").

¶ 90 Recently, in *People v. Buffer*, 2019 IL 122327, ¶ 27, our supreme court found that, to prevail on a claim that a juvenile's life sentence violated the eighth amendment, a juvenile defendant must show *both* (1) that he was "subject to a life sentence, mandatory or discretionary, natural or *de facto*," *and* (2) that "the sentencing court failed to consider youth and its attendant characteristics."

¶ 91 The *Buffer* court stated, "In determining when a juvenile defendant's prison term is long enough to be considered *de facto* life without parole, we choose to draw a line at 40 years." *Buffer*, 2019 IL 122327, ¶ 40. In the very next paragraph, the *Buffer* court clarified that "40 years or less" was *not de facto* life. *Buffer*, 2019 IL 122327, ¶ 41. The *Buffer* court was aware that some defendants would fall close to the line that it was drawing, but it believed that a categorical, bright-line rule was nonetheless desirable. The court observed: " '[C]lear, predictable, and uniform constitutional standards are especially desirable' in applying the eighth amendment." *Buffer*, 2019 IL 122327, ¶ 29 (quoting *Roper*, 543 U.S. at 594 (O'Connor, J., dissenting)). The *Buffer* court stated that it understood that drawing a line was subject to the objections always raised against categorical rules, but nonetheless it decided " 'a line must be drawn.' " *Buffer*, 2019 IL 122327, ¶ 29 (quoting *Roper*, 543 U.S. at 574 (majority opinion)). Thus, under *Buffer*, a *de facto* life sentence for a juvenile is one that is *more than* 40 years. See *Buffer*, 2019 IL 122327, ¶ 41.

¶ 92 Judge Wilson, back in 1977, could not have looked into his crystal ball and predicted all the literature and court cases that had yet to be written about youthful offenders. Thus, there is no evidence in the record that he considered "youth and its attendant characteristics" (*Buffer*, 2019 IL 122327, ¶ 27), as we now understand those terms to mean, or considered defendant's "impetuosity" or "peer pressure" (730 ILCS 5/5-4.5-105(a)(1), (2) (West 2016)), as defendant dashed out of a party in the middle of the night with a gun to go to an area where there was a fight.

¶ 93 B. Defendant Is Not a Juvenile

¶ 94 Defendant is not a juvenile and could have been paroled after 20 years under his sentence.

¶ 95 The problem for defendant in seeking to invoke eighth amendment cases such as *Buffer* is that the eighth amendment cases defendant cites involve a defendant who was "sentenced for an offense committed while a juvenile." See *Buffer*, 2019 IL 122327, ¶ 27. In the case at bar, defendant was born on May 4, 1958, and the offense was committed on October 10, 1976, just five months after he turned 18 years old. See *People v. Harris*, 2018 IL 121932, ¶¶ 59-61

(offenders 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases). Thus, defendant in the case at bar is not a juvenile.

¶ 96 As a result, courts have reviewed the cases of teenage offenders, such as defendant, under the proportionate penalties clause instead. Like defendant in the case at bar, the defendant in *Harris*, 2018 IL 121932, ¶ 1, was 18 years old at the time of his offense, rather than a juvenile. Like defendant in the case at bar, the *Harris* defendant claimed that he received a *de facto* life sentence that violated the proportionate penalties clause, and he raised an as-applied challenge to his sentence. *Harris*, 2018 IL 121932, ¶¶ 36-37. In *Harris*, our supreme court found: "[T]he record here does not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances. Accordingly, defendant's as-applied challenge is premature." *Harris*, 2018 IL 121932, ¶ 46.

¶ 97 Relying on *Harris*, defendant seeks leave to file his successive postconviction petition in order to develop the type of record that the court described in *Harris*. In *Harris*, the defendant had raised his as-applied claim on direct appeal, and our supreme court found that his claim was "more appropriately raised" in a postconviction proceeding (*Harris*, 2018 IL 121932, ¶ 48)—which is exactly what defendant seeks to do here. Except in the case at bar, defendant was given the right to be paroled after 20 years, and it is uncontroverted that defendant has been turned down for parole more than 30 times in 40 years. There is also no evidence in the record before us that Judge Wilson "consider[ed] youth and its attendant characteristics" before sentencing defendant. See *Buffer*, 2019 IL 122327, ¶ 27. Recently, the Illinois legislature provided a new sentencing scheme for juvenile defendants, requiring the sentencing court to consider "additional factors in mitigation in determining the appropriate sentence." 730 ILCS 5/5-4.5-105(a) (West 2016). The list of factors was taken from, and is consistent with, the United States Supreme Court's 2012 discussion in *Miller* of youth and its attendant characteristics. *Buffer*, 2019 IL 122327, ¶ 36 (discussing *Miller*, 567 U.S. at 477-78). The list includes considering the defendant's "age, impetuosity, and level of maturity" and whether he was subject to "peer pressure." 730 ILCS 5/5-4.5-105(a)(1), (2) (West 2016).

¶ 98 C. No Action Against the Board

¶ 99 The trial court observed that, if defendant was claiming improper action by the parole board, he could file a suit against the board. However, defendant's claim is that his sentence violates the proportionate penalties clause of the Illinois Constitution. There is no action against the parole board that he can bring to raise a claim pursuant to the Illinois Constitution's proportionate penalties clause.

¶ 100 Although a prisoner may file for a writ of *habeas corpus* in federal court if he can demonstrate that his custody is in violation of the United States Constitution (*Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996)), a claim under the Illinois Constitution does not qualify.

¶ 101 In addition, a prisoner may file for a writ of *mandamus* in state court to compel the board to provide a parole-eligible inmate with a parole hearing, but he may not use this action to compel parole or affect how the board exercises its discretion in granting or denying an inmate parole. *Hanrahan*, 174 Ill. 2d at 272; see generally *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 464-65 (2004) (*mandamus* is "used to compel a public official to perform a ministerial duty"). In a photograph that defendant submitted in support of his motion for leave to file a successive petition, which was discussed during oral argument before this court, the parole

board was depicted as surrounded by standing uniformed police officers as they considered defendant's case.[14] Ten officers stood directly behind the chairs of two seated parole board members. Although it is not possible to discern the exact distance, defendant claims that being so close to the members of the board constitutes undue pressure on the members. We do not know the dimensions of the room, the seating facilities, and the area where the proceedings occurred but suggest that any further parole hearing on this case be conducted in a large enough area where there would be adequate seating for the audience.

¶ 102    Also, an action for "a common law writ of *certiorari* may not be issued to review the merits" of the board's decision in denying parole. *Hanrahan*, 174 Ill. 2d at 281.

¶ 103    Thus, there is no viable action available for defendant to use against the board—and there is a reason for that. Our supreme court has "consistently held that parole is *** a matter of grace and executive clemency." *Hill v. Walker*, 241 Ill. 2d 479, 486 (2011); *Hanrahan*, 174 Ill. 2d at 275. Clemency is virtually unreviewable. See *Hanrahan*, 174 Ill. 2d at 279 ("the Board's parole-release decisions *** closely resemble those decisions found to be unreviewable in the federal courts"); *Snyder*, 208 Ill. 2d at 480 (executive clemency is an "essentially unreviewable power"). For example, a prisoner could not bring an action against the board, claiming that it violated due process by continuing to consider his prior death sentence, even though the supreme court had vacated the sentence on appeal. See *Hill*, 241 Ill. 2d at 484-85. As a result, an action against the board is not a vehicle for defendant's constitutional claim that his sentence violates the proportionate penalties clause.

¶ 104                                    D. Cause and Prejudice

¶ 105    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a statutory remedy for criminal defendants who claim that their constitutional rights were violated. *People v. Edwards*, 2012 IL 111711, ¶ 21. Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [the supreme] court has, in its case law, provided two bases upon which the bar against successive proceedings will be relaxed." *Edwards*, 2012 IL 111711, ¶ 22. Those two bases are (1) a showing of cause or prejudice or (2) a claim of actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. In the case at bar, defendant alleges only cause and prejudice, so we discuss only that basis below.

¶ 106    Under the cause-and-prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)).

¶ 107    "The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo*." *People v. Bailey*, 2017 IL 121450, ¶ 13; *People v. Wrice*, 2012 IL 111860, ¶ 50 (applying a *de novo* standard of review to the State's argument concerning lack of prejudice to the defendant, since these "arguments raise purely legal issues"). *De novo* consideration means that we perform the same analysis that a trial judge would perform. *In re*

---

[14]The evidentiary hearing was held solely on the section 2-1401 petition. No evidentiary hearing was held on defendant's proportionality claim because the trial court denied defendant leave to file a successive postconviction petition. The photograph in question was attached as an exhibit to defendant's memo in support of his motion for leave.

*N.H.*, 2016 IL App (1st) 152504, ¶ 50 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 108   While exercising *de novo* review, we observe that the trial court found that defendant had established cause, and we agree. A defendant "shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." 725 ILCS 5/122-1(f) (West 2018). In the case at bar, defendant filed his first postconviction petition in 1987. In 1987, defendant could not have anticipated the *Miller* line of cases starting in 2012 and certainly could not have raised a claim based on a line of cases that had not even been decided yet. Thus, we find, as did the trial court, that defendant established cause.

¶ 109   Second, we find that defendant established prejudice. In the case at bar, defendant has already served what our supreme court has found to be a *de facto* life sentence without parole for a minor defendant, although defendant was not a minor defendant and had the right to be considered for parole. See *Buffer*, 2019 IL 122327, ¶ 40. However, because defendant was not paroled, he claims his sentence is a life sentence without parole. In this way, defendant's sentence differs from a fixed 40-year sentence, which the *Buffer* court found was not a *de facto* life sentence. *Buffer*, 2019 IL 122327, ¶ 41. What is sought by defendant, in part, is a known endpoint, which could be a term of years or could be life. Our supreme court has found that the proper vehicle for an 18-year old to raise an as-applied challenge to a *de facto* life sentence is a postconviction proceeding. *Harris*, 2018 IL 121932, ¶ 48. Defendant could not have possibly raised such a challenge in his initial postconviction proceeding in 1987, and our supreme court has found that a ruling without a developed record is "premature." *Harris*, 2018 IL 121932, ¶ 46.[15] Defendant has shown prejudice by establishing a "catch-22."[16] Without a developed record, he cannot show his constitutional claim has merit, and without a meritorious claim, he cannot proceed to develop a record.

¶ 110   Further, prejudice is shown by the fact that the appellate court misstated his age in our prior Rule 23 order when we reviewed his sentence and found that it was not excessive. *Carrasquillo*, No. 1-78-621, slip order at 9 (stating that defendant was "19 years old at the time of the crime"). Also, as we observed above, defendant's sentence was one of the very harshest that Judge Wilson delivered, and Judge Wilson did so during a year when he had accepted a bribe, during a trial with a conspicuous police presence, and to an 18-year-old with no prior criminal record. As we observed above, we could not find that the trial court abused its discretion in finding that the sentence, by itself, was evidence of bias. The killing of a police officer is a serious issue for all of society. However, defendant should be given the opportunity of developing a record, as suggested by our supreme court, with a successive postconviction petition.

---

[15]Although the trial court held an evidentiary hearing on defendant's section 2-1401 petition and Wilson's alleged bias, the trial court did not make any findings about "how the evolving science on juvenile maturity and brain development *** applie[d] to defendant's specific facts and circumstances." *Harris*, 2018 IL 121932, ¶ 46.

[16]A "catch-22" is defined as "[a] dilemma or difficult circumstance from which there is no escape because of mutually conflicting or dependent conditions." Lexico, https://www.lexico.com/en/definition/catch-22 (last visited Mar. 23, 2020) [https://perma.cc/A52N-HTMM].

¶ 111   Lastly, the uncontradicted evidence on this appeal shows that defendant has been turned down over 30 times for parole in almost as many years, that certain parole board members will never permit his parole, and that, according to the prior chairman of the parole board who repeatedly reviewed his case, defendant had an "excellent prison record and *** strong family and community support." Additionally, as we stated earlier, defendant submitted a photograph in support of his motion for leave to file a successive petition. That photo depicts 10 uniformed officers standing directly behind two of the parole board members as the board considered defendant's case. Defendant claims that the officers' stance so close to the members of the board constituted undue pressure on its members.

¶ 112   For all these reasons, defendant has established prejudice, as well as cause. We reverse the trial court's February 21, 2018, order that denied defendant leave to file a successive postconviction petition and grant him leave to file.

¶ 113                                   CONCLUSION

¶ 114   In conclusion, we affirm the trial court's January 24, 2018, order dismissing defendant's section 2-1401 petition but reverse the trial court's February 21, 2018, order denying defendant leave to file a successive postconviction petition.

¶ 115   Affirmed in part and reversed in part.