2023 IL App (1st) 211241

FIRST DISTRICT
FIFTH DIVISION
August 18, 2023

No. 1-21-1241

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 76 C 005807-01 |
| | ) | |
| RONNIE CARRASQUILLO, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge Presiding |

JUSTICE LYLE delivered the judgment of the court, with opinion.
Presiding Justice Delort concurred in the judgment and opinion.
Justice Navarro dissented, with opinion.

## OPINION

¶ 1     This is an appeal from the third-stage dismissal of defendant Ronnie Carrasquillo's successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2018)). In his petition, Mr. Carrasquillo, who was 18 years old at the time of the offense, alleged that his indeterminate sentence of 200 to 600 years entered in 1978 by Cook County circuit court judge Frank Wilson violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because it was entered without adequate consideration of his youth and its attendant characteristics. The circuit court denied Mr. Carrasquillo leave to file the successive petition, but this court reversed that decision and remanded to give Mr. Carrasquillo an opportunity to submit evidence on his claims. *People v. Carrasquillo*, 2020 IL App (1st) 180534.

¶ 2       On remand, the court held an evidentiary hearing where the court heard testimony from Mr. Carrasquillo, his friends, and family. Also, Mr. Carrasquillo submitted a psychological evaluation from a clinical psychologist who opined that, at the time of his offense, Mr. Carrasquillo's brain development was functionally equivalent to that of a juvenile. The circuit court nonetheless denied the petition, finding that Mr. Carrasquillo's sentence did not violate the proportionate penalties clause because he was eligible for parole.

¶ 3       On appeal, Mr. Carrasquillo, now 65 years old, contends that the circuit court erred in denying his petition where his sentence of 200 to 600 years entered without consideration of his youth and its attendant characteristics violates the proportionate penalties clause. Mr. Carrasquillo maintains that his eligibility for parole is "illusory" because he has repeatedly been denied parole for more than 20 years despite ample evidence of his significant rehabilitation since his incarceration. He posits that some members of the Illinois Prisoner Review Board (Board) will never grant him release due to the nature of his offense. He contends that we should reverse the circuit court's dismissal of his petition and remand the matter for a new sentencing hearing or order his immediate release from prison based on the fact that he has already served what Illinois courts have recognized as a *de facto* life sentence for juveniles.

¶ 4                                I. BACKGROUND

¶ 5       This court has previously set forth the facts that gave rise to Mr. Carrasquillo's conviction and sentence in its order on his direct appeal. *People v. Carrasquillo*, No. 1-78-621 (1979) (unpublished order under Illinois Supreme Court Rule 23). As relevant here, the record from Mr. Carrasquillo's trial shows that he was attending a party when a physical altercation broke out on the street. Mr. Carrasquillo went down to the street to investigate and on the way took a gun from

David Gonzalez. When he reached street level, Mr. Carrasquillo fired the gun four times in the direction of the crowd, fatally wounding Terrance Loftus, a plainclothes Chicago police officer who had been trying to break up the fight. Mr. Carrasquillo admitted that he fired the gun, but he maintained that he fired the gun above the crowd in order to break up the fight and did not intend to hit anyone. An investigating officer noted that two of the bullets struck windows in a deserted YMCA building across the street. One of the bullets went through a window on the first floor of the building, and one of them struck a window on the second floor of the building. The bullet holes were 8 to 9 feet above the ground and 12 to 14 feet above the ground, respectively. The court found Mr. Carrasquillo guilty of murder and sentenced him to an indeterminate term of 200 to 600 years' imprisonment. This court affirmed Mr. Carrasquillo's conviction and sentence on direct appeal over his claims that he was not proved guilty beyond a reasonable doubt, that he should have been convicted of involuntary manslaughter rather than murder, and that his sentence of 200 to 600 years was excessive. *Id.*

¶ 6    On August 11, 2017, Mr. Carrasquillo filed a motion for leave to file a successive postconviction petition. In his petition, Mr. Carrasquillo asked the circuit court to vacate his unconstitutional "*de facto* life without parole sentence." Mr. Carrasquillo asserted that he satisfied the cause-and-prejudice test for filing a successive petition because he demonstrated cause where the United States Supreme Court's ruling in *Miller v. Alabama*, 567 U.S. 460 (2012), and subsequent cases applying those principles to 18-year-olds were not available earlier. He also contended that he demonstrated prejudice where he was sentenced to a *de facto* life sentence "effectively without parole" for a crime he committed when he was 18 and the sentencing court did not give adequate consideration to his youth and its attendant characteristics.

¶ 7      The circuit court denied Mr. Carrasquillo leave to file his successive petition. The court found that Mr. Carrasquillo had demonstrated cause because the line of cases concerning life and *de facto* life sentences for juveniles and young adults were decided after Mr. Carrasquillo was sentenced and after he filed his initial postconviction petition. The court determined, however, that Mr. Carrasquillo failed to establish prejudice, finding that he was not sentenced to a *de facto* life sentence because he was eligible for parole. The court noted that, pursuant to section 3-3-3(a)(1) of the Unified Code of Corrections, Mr. Carrasquillo was eligible for parole after serving 20 years of his sentence. See 730 ILCS 5/3-3-3(a)(1) (West 2016) ("[E]very person serving a term of imprisonment under the law in effect prior to the effective date of this amendatory Act of 1977 shall be eligible for parole when he or she has served: (1) the minimum term of an indeterminate sentence less time credit for good behavior, or 20 years less time credit for good behavior, whichever is less[.]").

¶ 8      Mr. Carrasquillo appealed, arguing that the court erred in denying him leave to file. This court reversed the circuit court's denial of leave to file, finding that Mr. Carrasquillo had established prejudice because he had already served more than 40 years in prison, the line our supreme court drew to determine a *de facto* life sentence, and, despite being eligible for parole, Mr. Carrasquillo had not been granted parole despite numerous opportunities. *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109. We acknowledged that, as an 18-year-old offender, Mr. Carrasquillo's circumstances do not fall directly under *Miller* and its progeny but that the supreme court in *People v. Harris*, 2018 IL 121932, found that young adult offenders facing life sentences should have an opportunity to develop the record to support their constitutional claims. *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109. As such, this court found that Mr. Carrasquillo demonstrated prejudice by

"establishing a 'catch-22.'[1] Without a developed record, he cannot show his constitutional claim has merit, and without a meritorious claim, he cannot proceed to develop a record." *Id.* This court determined that Mr. Carrasquillo should therefore have the opportunity to develop the record and reversed the circuit court's denial of leave to file. *Id.* ¶ 110.

¶ 9 On remand, Mr. Carrasquillo filed an amended petition, to which he attached a report from a forensic psychologist. In the report, Dr. Antoinette Kavanaugh set out to address three questions:

"1) Do the characteristics associated with youth (as described in *Miller* and *Montgomery* [*v. Louisiana*, 577 U.S. 190 (2016)]) apply to those who are under 19 years of age? 2) How do the '*Miller* factors' apply to the case at hand? 3) What evidence exists suggesting Mr. Carrasquillo has matured and displays the possibility for rehabilitation as referenced in *Miller* and *Montgomery*?"

Dr. Kavanaugh stated that a person's "[p]sychological maturity" continues to develop after they turn 18. Dr. Kavanaugh explained that an individual under 20 years old could demonstrate adult-like behavior when he is alone or not under stress but, in the presence of peers or under stress or emotional arousal, "their behavior and thinking regresses and they engage in risky behaviors with worse outcomes." Dr. Kavanaugh concluded that "from a neurobiological perspective, 18-year-olds are more like adolescents than adults. Research demonstrates they are as likely to display the characteristics of youth such as the impulsivity, risk taking, and suggestibility to peer pressure as someone who is 17 years old."

¶ 10 Dr. Kavanaugh then applied the *Miller* factors to the case at hand, finding that Mr. Carrasquillo's family and home life "contained factors that negatively impact[] brain development in a manner that would have made him *less* developed than an 18-year-old who did not have similar

experiences." (Emphasis in original.) With regard to Mr. Carrasquillo's possibility of rehabilitation, Dr. Kavanaugh noted that he had been "relatively discipline-free" during his incarceration and had demonstrated growth and improvement in numerous areas including his education and religious studies. Dr. Kavanaugh concluded:

"It is my clinical opinion based on my knowledge of the scientific literature that from a brain maturation perspective, a 'typical' 18-year-old is more like an[ ] adolescent than an adult. Mr. Carrasquillo presented with many factors that made him atypical and made his brain maturation less mature than his typical same age peers. I have outlined the ways in which the *Miller* factors and the characteristics associated with youth apply to the case at hand. Finally, in my clinical opinion, Mr. Carrasquillo's stellar prison record[ ] bodes well for his rehabilitation."

¶ 11    Mr. Carrasquillo attached to his petition an affidavit and affidavits from his siblings in which they detailed their childhood and the threats of violence that they received on account of their race. Mr. Carrasquillo also submitted an affidavit from Jorge Montes, a former chairman of the Board, who averred that there were "several members of the Board *** who will never vote for parole when the victim is a police officer." Mr. Montes concluded that, because the victim of his crime was a police officer, it was "highly unlikely that Mr. Carrasquillo will receive parole, if at all, for many years."

¶ 12    The State filed a motion to dismiss the amended petition, but the court denied the motion and advanced the petition to the third stage of postconviction proceedings for an evidentiary hearing.

¶ 13    At the evidentiary hearing, Mr. Carrasquillo testified that his parents divorced when he was four or five years old. After the divorce, he stayed with his mother and his siblings. When his mother was working, his older sister, who was 10 years old at the time, would watch them. When he was 10 years old, the family was evicted from their home, and Mr. Carrasquillo went to live with his father and his new family. After living with his father for a year, Mr. Carrasquillo was reunited with his mother and lived with her again. He described his mother as a "strictarian" who kept the children to a rigid schedule and made sure they were in bed by 8 p.m. When he was 11 years old, he started experiencing racially based violence in his neighborhood and at school. When he was 12 years old, he was physically beaten by a group of people outside of his school. He was not in a gang at the time, and his only interest was "strictly [playing] sports." Eventually, Mr. Carrasquillo joined a gang for protection from the other gangs in the area.

¶ 14    When Mr. Carrasquillo was 15 years old, his mother died, and he went back to live with his father. Mr. Carrasquillo and his brother, Paul Carrasquillo (Paul), lived in an apartment above a garage in their father's apartment building, but their father would not let their sister live with them. Their father did not allow them to eat with his new family, so they would eat with friends. Mr. Carrasquillo testified that their father did not provide any supervision and that he and Paul were "able to do whatever we wanted to do." Eventually, the garage where he had been living burned down along with all of his possessions. Mr. Carrasquillo and Paul went to live in the basement of the apartment building, which was unfurnished.

¶ 15    When Mr. Carrasquillo started high school, he did not attend classes but only played sports for the school. Mr. Carrasquillo did not finish high school because he was arrested before he graduated. Mr. Carrasquillo then testified regarding the shooting that led to his arrest and

conviction. Mr. Carrasquillo testified that he was at a party when he heard people fighting outside. On his way outside to see what was happening, he ran into Mr. Gonzalez, who was holding a gun. Mr. Gonzalez's gun jammed, so Mr. Carrasquillo took the gun so that he could fix it. When he got outside, Mr. Carrasquillo saw a group of people fighting in the street. Mr. Carrasquillo believed based on his experiences in the neighborhood that someone could get killed if he did not do something to break up the fight. Mr. Carrasquillo fired four shots from the gun he took from Mr. Gonzalez. He did not stay to see if he shot anyone and walked away from the scene.

¶ 16    Mr. Carrasquillo then testified regarding his rehabilitation since he had been incarcerated. Within a year of arriving at prison, he obtained his GED and began working with an electrician in the prison. Eventually, he stepped away from the gangs, which caused other gangs to target him as "easy pickings." Mr. Carrasquillo helped create a Hispanic culture change committee within the prison that brought groups into the prison to help educate the gang members and deter them from participating in the gangs.

¶ 17    Jesse Carrasquillo (Jesse), Mr. Carrasquillo's older brother, testified about their childhood including the sudden death of their mother and the racism they faced as children. Jesse was out of state at college when the shooting in this case occurred.

¶ 18    Nelson Vargas testified that he met Mr. Carrasquillo in grammar school and they were in a gang together. Mr. Vargas testified that Mr. Carrasquillo joined the gang after being beaten by members of another gang, with Mr. Carrasquillo telling Mr. Vargas: "[I]f I'm going to get beat up for being in your gang then I might as well join your gang." Mr. Vargas saw Mr. Carrasquillo again when they were both held at the same prison in 1979. Mr. Vargas thought he would have problems with Mr. Carrasquillo because he did not send him money or visit him while he was in

prison, which was expected of gang members, but Mr. Carrasquillo took Mr. Vargas in "like a friend," got him a job in the prison, and taught him how to read. When Mr. Vargas was ready to be released from prison, Mr. Carrasquillo told Mr. Vargas to be a father to his children and get away from the gangs.

¶ 19    After Mr. Vargas was released from prison, he became a pastor and continued to visit Mr. Carrasquillo in prison. Mr. Vargas learned that Mr. Carrasquillo was imprisoned with Carlos Colon, the man who killed his son. Mr. Carrasquillo encouraged Mr. Vargas to reconcile with Mr. Colon, telling him that Mr. Colon was a "good guy." Mr. Vargas eventually met with Mr. Colon and forgave him.

¶ 20    Mr. Colon testified that he met Mr. Carrasquillo while he was in prison for the murder of Mr. Vargas's son. Mr. Colon observed that Mr. Carrasquillo was able to deescalate fights and diffuse conflicts around the prison. He viewed Mr. Carrasquillo as a "father figure" who encouraged him to think about his life after prison. Mr. Colon testified that Mr. Carrasquillo helped him connect with Mr. Vargas and encouraged him to make amends.

¶ 21    Jose Lopez testified that he met Mr. Carrasquillo as part of a research study and community outreach program that he was participating in that was examining Puerto Rican street gangs in the 1970s in Chicago. Mr. Lopez was in contact with Mr. Carrasquillo from 1972 until he was arrested in 1976. During that period, Mr. Carrasquillo was a member of the Imperial Gangsters. Mr. Lopez described Mr. Carrasquillo's family as a "challenged family with obviously a lack of a parental unit." Mr. Lopez testified that the family struggled to meet the "very basics of survival." Mr. Lopez had not seen Mr. Carrasquillo since 1976 but did keep in contact with him through letters that Mr.

Carrasquillo sent while he was in prison. Mr. Lopez noted that Mr. Carrasquillo had become "deeply religious."

¶ 22    Gilberto Morales testified that he met Mr. Carrasquillo when he was 15 and Mr. Carrasquillo was 12. He described Mr. Carrasquillo at that time as "just another kid" who got caught up in gang life. Mr. Morales testified that he was also a member of the Imperial Gangsters. When he met Mr. Carrasquillo, he knew that his mother had passed away and that members of the gang would go to his house to party. Mr. Morales saw Mr. Carrasquillo again when they were in prison together in the late 1990s. Mr. Carrasquillo had backed away from gang life and was working at the prison and teaching. Since he left prison in 1999, Mr. Morales has spoken with Mr. Carrasquillo by phone weekly.

¶ 23    Mr. Carrasquillo also presented testimony from witnesses who discussed his rehabilitation since he entered prison. Alexandra Pruitt testified that she was a recent law school graduate who had studied Mr. Carrasquillo's case while she was an undergraduate. She testified that, in her research of Mr. Carrasquillo's case, she discovered that he had strong community support and believed that he had the ability to positively influence others. Manuel Mill testified that he met Mr. Carrasquillo as part of a prison ministry visit. Mr. Mill saw the positive influence that Mr. Carrasquillo had on the other inmates and noted that he had encouraged a number of prisoners to participate in a program that helped to connect churches with recently released individuals. Mr. Carrasquillo also presented testimony from Roberto Maldonado,[1] the alderman of the 26th Ward

---

[1]The record shows that the trial court judge, Alfredo Maldonado, informed the parties that he was not related to Alderman Maldonado despite the fact that they shared the same last name. He told the parties, however, that he did volunteer work for Alderman Maldonado as an attorney 12 years ago. Judge Maldonado stated that he did not believe that this previous volunteer work would affect his ability to be fair and impartial in this case, but he stepped off the bench to give the parties an opportunity to discuss whether

of the City of Chicago. Alderman Maldonado testified that he did not know Mr. Carrasquillo personally but knew members of his family and was familiar with his case. Alderman Maldonado testified that, when Mr. Carrasquillo's case first came to his attention in 2002, he "ask[ed] questions" and did his "due diligence" and concluded that Mr. Carrasquillo deserved to be released on parole. He continued to hold that opinion at the time of the hearing.

¶ 24    The State presented the testimony of Jason Sweat, the chief legal counsel for the Board. Mr. Sweat explained how the Board conducted hearings both before and after the COVID-19 pandemic. Mr. Sweat acknowledged that a number of Chicago police officers attend Mr. Carrasquillo's hearings before the Board. Mr. Sweat testified that attendees are permitted to stand and introduce themselves at hearings but would not be permitted to stand behind the Board during a vote.

¶ 25    The court denied Mr. Carrasquillo's petition in a 48-page written order and also made oral findings. In its oral findings, the court determined that the initial question it had to answer was whether Mr. Carrasquillo was someone who was being held without the possibility of parole as that phrase was used within the context of *Miller* and its progeny. The court observed that Mr. Carrasquillo had "many[,] many, many" parole board hearings but had not been granted parole. The court noted the supreme court's recent opinion in *People v. Dorsey*, 2021 IL 123010, where the court addressed, in *dicta*, the issue of parole within the context of *Miller*. The circuit court found that, based on *Dorsey*, Mr. Carrasquillo did not qualify as someone who had been sentenced to life in prison without the possibility of parole. The court determined that, although Mr.

---

they had any issues with him continuing on the case. The attorneys held a discussion off the record and then indicated on the record that they had no objections to Judge Maldonado continuing to preside over the case.

Carrasquillo had not been granted parole, he nonetheless had the opportunity for parole. The court noted that Mr. Carrasquillo did present evidence as to "the prevailing science regarding youth and the attendant circumstances" as applied to him. The court noted that evidence was "pretty substantial" and unrebutted by the State, but the court found that the "initial threshold" question was the possibility of parole, which foreclosed relief for Mr. Carrasquillo in this case.

¶ 26 The court also rejected Mr. Carrasquillo's argument that, irrespective of *Miller*, his sentence violated the proportionate penalties clause because it shocked the moral sense of the community based on our society's evolving standards. The court noted that, if Mr. Carrasquillo were sentenced today, he would face a minimum sentence of 45 years' imprisonment with a maximum sentence of natural life without the opportunity for parole. The court determined that Mr. Carrasquillo would therefore "still be substantially in the same position he is now." The court concluded that Mr. Carrasquillo's sentence was therefore not excessive under the proportionate penalties clause.

¶ 27 The court expanded on its oral findings in its written order, again noting that Dr. Kavanaugh's report was "quite compelling in its analysis as to the prevailing scientific community's understanding of juvenile maturity and brain development, and, specifically, as to petitioner's tragic upbringing and own immaturity at the time of the murder." The court noted that it was "interesting" that the State did not rebut or challenge Dr. Kavanaugh's conclusions. The court found, however, that Dr. Kavanaugh's report would only become "dispositive" if Mr. Carrasquillo's sentence "lacked an opportunity for parole."

¶ 28 In determining whether Mr. Carrasquillo lacked an opportunity for parole, the circuit court again found the *dicta* in *Dorsey* discussing the issue of parole to be "decisive" in addressing Mr.

Carrasquillo's claims. The court observed that Mr. Carrasquillo became eligible for parole after serving 20 years of his sentence and the Board had conducted numerous hearings to determine whether he should be granted parole. The court rejected Mr. Carrasquillo's arguments that his opportunity for parole was "illusory," finding that the fact that he had not been granted parole was not determinative and an opportunity for parole is all that is necessary for the purposes of *Miller*. The court also found that Mr. Carrasquillo had failed to show that the Board was biased against him because he was convicted of murdering a police officer, noting that two other inmates who had been convicted of the same offense had recently been granted parole.[2] The court concluded that, because Mr. Carrasquillo had been afforded the possibility of parole, he was not entitled to *Miller* protections.

¶ 29    The court also found that Mr. Carrasquillo's sentence did not shock the moral conscience, finding that this claim was barred by the doctrine of *res judicata* because he had previously argued on direct appeal that his sentence was excessive. Nonetheless, the court concluded that Mr. Carrasquillo's sentence was constitutionally valid even considering the "community's evolving standards of decency" because of the nature of Mr. Carrasquillo's offense and the fact that he would face a similar effective sentence if he were sentenced today despite the "astronomically high at first blush" term of years he received.

---

[2]The two other inmates in question were Joseph Hurst and Johnny Veal. Mr. Hurst was arrested in 1967 for the murder of a Chicago police officer and the attempted murder of three additional Chicago police officers. At the time of his arrest, he was 24 years old. He received an indeterminate sentence of 100 to 300 years. The Board granted Mr. Hurst parole in February 2021 after he had been incarcerated for more than 53 years.

Mr. Veal was arrested in July 1970 for the murder of two Chicago police officers and sentenced to an indeterminate term of 100 to 199 years. Mr. Veal was 17 years old at the time of the offense. The Board granted Mr. Veal parole in February 2021, after he had been incarcerated for more than 50 years.

¶ 30    Mr. Carrasquillo filed a timely notice of appeal from the circuit court's order on September 20, 2021. We find that we have jurisdiction to consider the merits of this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 651(a) (eff. July 1, 2017).

¶ 31                                     II. ANALYSIS

¶ 32    On appeal, Mr. Carrasquillo contends that the circuit court erred in denying his petition where his sentence violates the proportionate penalties clause of the Illinois Constitution. Mr. Carrasquillo maintains that he received a *de facto* life sentence without consideration of his youth and its attendant characteristics and that, despite being technically eligible for parole, he will never have a meaningful opportunity for release. Mr. Carrasquillo maintains that he has done everything possible to be granted parole but he will be continually denied parole because he was convicted of murdering a police officer. He maintains that the evidence he presented at the evidentiary hearing demonstrated that he was the functional equivalent of a juvenile at the time of the offense and illustrated his rehabilitation since he entered prison. Mr. Carrasquillo also maintains that his sentence violates the proportionate penalties clause irrespective of *Miller* considerations because the unduly harsh sentence entered by a corrupt trial court judge[3] shocks the moral sense of our community.

¶ 33                              A. Standard of Review

¶ 34    This appeal arises following the circuit court's denial of Mr. Carrasquillo's postconviction petition following a third stage evidentiary hearing. At this stage of proceedings, the petitioner has

_____

[3]Judge Wilson, who sentenced Mr. Carrasquillo, was investigated for accepting a bribe to acquit a mafia hitman in May 1977 as part of "Operation Greylord." Wilson committed suicide in February 1990 after he was approached by the FBI.

the burden of proving a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 472-73 (2006). An evidentiary hearing allows the parties to "develop matters not contained in the trial record and, thus, not before the appellate court." *People v. Lester*, 261 Ill. App. 3d 1075, 1078 (1994). At the evidentiary hearing, the circuit court serves as the fact finder, and it is the circuit court's function to determine witness credibility, decide the weight to be given the testimony and evidence, and resolve any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34. "Following an evidentiary hearing where fact-finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous." *People v. Beaman*, 229 Ill. 2d 56, 72 (2008). This standard recognizes that we give great deference to the trial court's factual findings because it is in the best position to weigh the evidence and the credibility of the witnesses. *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). We will find that the trial court's ruling is manifestly erroneous where the error is "clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

¶ 35                    B. *Miller* and Its Progeny

¶ 36    In his amended successive petition, Mr. Carrasquillo contended that his sentence of 200 to 600 years for an offense he committed when he was 18 years old violates the proportionate penalties clause because it amounts to a *de facto* life sentence that was entered without consideration of his youth and its attendant characteristics. Mr. Carrasquillo's contentions are based on a line of United States Supreme Court and Illinois Supreme Court cases that have found that *de jure* life and *de facto* life sentences for juvenile offenders are unconstitutional if the sentencing court does not take into consideration the circumstances of youth before entering the sentence.

¶ 37    In *Miller*, the United States Supreme Court held that mandatory life sentences for juveniles violate the eighth amendment's prohibition against cruel and unusual punishment. *Miller*, 567 U.S. at 489. *Miller* requires sentencing courts in homicide cases to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. The Supreme Court expanded on its decision in *Miller* in *Montgomery v. Louisiana*, 577 U.S. 190 (2016). In that case, the Court determined that *Miller* should apply retroactively and that state courts must apply *Miller* in collateral proceedings. *Id.* at 205. The Court further found that *Miller* did not prohibit all life sentences for juveniles but reserved life sentences for "the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id.* at 208.

¶ 38    In *People v. Reyes*, 2016 IL 119271, our supreme court expanded the holding of *Miller*, finding that *Miller* applied to so-called "*de facto*" life sentences for juveniles. The supreme court found that such sentences violate *Miller* where the sentence is so long that it amounts to "a mandatory term of years that is the functional equivalent of life without the possibility of parole." *Id.* ¶ 9. In *People v. Buffer*, 2019 IL 122327, ¶ 40, our supreme court determined that a prison term of more than 40 years without parole is considered a *de facto* life sentence.

¶ 39    Unlike the defendants in these cases, however, Mr. Carrasquillo was not a juvenile at the time of his offense. Therefore, *Miller* does not apply directly to his circumstances. *Harris*, 2018 IL 121932, ¶ 45. Accordingly, we reversed the circuit court's denial of leave to file the successive petition to give Mr. Carrasquillo an opportunity to develop the record on his constitutional claims. *Carrasquillo*, 2020 IL App (1st) 180534, ¶¶ 109-10 (citing *Harris*, 2018 IL 121932, ¶¶ 46, 48). On remand, the circuit court was presented with two questions: (1) whether, at the time of the

offense, Mr. Carrasquillo was the functional equivalent of a juvenile such that the sentencing court's failure to give adequate consideration to his youth before sentencing him to a *de facto* life sentence was a violation of his constitutional rights pursuant to *Miller* and *Montgomery* and (2) whether Mr. Carrasquillo's 200-to-600-year indeterminate sentence was the equivalent of a *de facto* life sentence without parole under *Reyes* and *Buffer*. The circuit court reached only the second question, finding that the fact that Mr. Carrasquillo was eligible for parole after serving 20 years of his sentence meant that he was not serving a *de facto* life sentence and thus his sentence, regardless of his functional age, did not implicate *Miller*. Accordingly, we will first address whether Mr. Carrasquillo's eligibility for parole compels a finding that he is not serving a *de facto* life sentence and therefore cannot show a constitutional violation under *Miller*.

¶ 40                                Eligibility for Parole

¶ 41    As discussed, the circuit court dismissed Mr. Carrasquillo's petition, finding that, although he had not been granted parole, his eligibility for parole after serving 20 years of his sentence meant that his indeterminate sentence was not a *de facto* life sentence. Mr. Carrasquillo maintains that this finding ignored the undisputed evidence presented at the evidentiary hearing and also violated the "law of the case" doctrine where this court already found in his previous appeal that his sentence was a *de facto* life without parole sentence. Mr. Carrasquillo further asserts that his eligibility for parole is "illusory" because, although he is technically eligible for parole, he will never have a meaningful opportunity for release.

¶ 42    We first reject Mr. Carrasquillo's assertion that the circuit court's ruling violated the "law of the case" doctrine. "The law of the case doctrine provides that 'questions of law decided on a previous appeal are binding on the trial court on remand as well as on the appellate court on a

subsequent appeal.' " *Grundhoefer v. Sorin*, 2018 IL App (1st) 171068, ¶ 10 (quoting *Norris v. National Union Fire Insurance Co. of Pittsburgh*, 368 Ill. App. 3d 576, 580 (2006)). Mr. Carrasquillo maintains that this court's reversal of the trial court's denial of leave to file in the previous appeal was an implicit finding that his sentence was a *de facto* life without parole sentence. A review of our decision, however, shows that this court made no such finding. Our concern in the previous appeal was solely whether the circuit should have granted Mr. Carrasquillo leave to file a successive petition and had no bearing on the validity of his claims. Any discussion of whether Mr. Carrasquillo's sentence fell within the ambit of *Miller* was made for the purpose of discussing whether he satisfied the cause-and-prejudice test to file a successive petition. Accordingly, we do not find that the circuit court violated the "law of the case" doctrine by denying Mr. Carrasquillo's petition on the basis that he was eligible for parole.

¶ 43    We do, however, find that the circuit court erred in denying Mr. Carrasquillo's petition based on the supreme court's ruling in *Dorsey*, 2021 IL 123010. In *Dorsey*, the supreme court addressed the issue of whether good-conduct credit was relevant to a determination of what constitutes a *de facto* life sentence for a juvenile offender under *Miller*. *Id.* ¶ 1. The juvenile defendant in *Dorsey* was sentenced to a 76-year term of imprisonment for one count of first degree murder and two counts of attempted first degree murder. *Id.* ¶ 19. The defendant filed a successive postconviction petition arguing that his sentence violated the eighth amendment and the United States Supreme Court's ruling in *Miller*. *Id.* ¶¶ 23-24.

¶ 44    In addressing the defendant's claim, the supreme court observed that he was eligible for day-for-day credit because he was sentenced in 1998, before the truth-in-sentencing statute was validly enacted. *Id.* ¶ 50. The court concluded that the defendant therefore had an opportunity to

demonstrate maturity and rehabilitation so that he would be required to serve only 38 years of the 76-year sentence. *Id.* The court therefore found that the defendant "was not sentenced to the functional equivalent of a life sentence without the possibility of parole in violation of *Buffer*'s more-than-40-years pronouncement." *Id.*

¶ 45    The court continued that the statutory scheme whereby the defendant could shorten his sentence by earning good conduct credit was "at least on par with discretionary parole for a life sentence," which the *Dorsey* court observed had "specifically been held by the Supreme Court to pass muster under the eighth amendment." *Id.* ¶ 54 (citing *Montgomery*, 577 U.S. at 212). The *Dorsey* court rejected the defendant's argument that the good-conduct credit was not relevant to a determination of whether his sentence was a *de facto* life sentence because the credit was not guaranteed. *Id.* ¶¶ 55-56. Citing the Supreme Court's decision in *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 8 (1979), the *Dorsey* court found that, like good conduct credit, "[a] discretionary parole system *** provides no more than 'a mere hope' that a benefit will be obtained" "[a]nd this hope is 'not protected by due process.' " *Dorsey*, 2021 IL 123010, ¶ 56 (quoting *Greenholtz*, 442 U.S. at 11). The court concluded that, "[d]espite this lack of certainty in the parole system, the Supreme Court has nonetheless held that extending parole eligibility to juvenile offenders satisfies the eighth amendment and that a State may remedy a *Miller* violation by merely permitting the offender to be considered for parole without any resentencing." *Id.* (citing *Montgomery*, 577 U.S. at 212).

¶ 46    The circuit court here found the supreme court's ruling in *Dorsey* "decisive" in addressing Mr. Carrasquillo's proportionate penalties claim, and on appeal the State asserts that the *Dorsey* decision provides "guidance" for this court on how to evaluate Mr. Carrasquillo's claims. The

circuit court's determination that *Dorsey* is decisive here, however, is flawed for one significant reason. The *Dorsey* court's discussion of good conduct credit and its *dicta* on parole was made within the context of the eighth amendment, not the proportionate penalties clause. Indeed, the *Dorsey* court did not reach the merits of the defendant's claim that his sentence violated the proportionate penalties clause because the court rejected that argument on procedural grounds, finding that the claim was forfeited and barred by *res judicata*. *Id.* ¶¶ 70, 73.

¶ 47    The distinction between whether the defendant's claim was addressed pursuant to the eighth amendment or the proportionate penalties clause is significant because the proportionate penalties clause provides additional limitations on penalties "beyond those afforded by the eighth amendment." *People v. Clemons*, 2012 IL 107821, ¶ 39. The proportionate penalties clause "focuses on the objective of rehabilitation," goes "beyond the framers' understanding of the eighth amendment[,] and is not synonymous with that provision." *Id.* ¶ 40. Within the context of *Miller*, our supreme court has expressly found that a young adult's claims under *Miller* are expressly foreclosed under the eighth amendment, but the court left open the door for a young adult offender to make such claims under the proportionate penalties clause. *Harris*, 2018 IL 121932, ¶¶ 48, 61. Thus, we find that the *Dorsey* court's pronouncement that the eighth amendment is not violated where a defendant has the opportunity for release before 40 years' imprisonment through either good conduct credit or parole is not decisive of the issue before us.

¶ 48    Although the majority in *Dorsey* did not reach the issue of whether the defendant's sentence violated the proportionate penalties clause, Justice Neville did address that claim in his dissent. *Dorsey*, 2021 IL 123010, ¶¶ 106-26 (Neville, J., dissenting). Justice Neville recognized, as we have discussed, that the proportionate penalties clause provides greater sentencing

protections than those contemplated by the eighth amendment. *Id.* ¶ 107. In discussing whether the defendant had satisfied the prejudice prong of the cause-and-prejudice test under the proportionate penalties clause, Justice Neville noted the proportionate penalties clause's emphasis on rehabilitation:

> "Although the seriousness of a defendant's conduct may in many cases outweigh mitigating factors regarding a particular defendant, it does not follow that a defendant's personal characteristics are irrelevant. [Citation.] Rather, the proportionate penalties clause demands consideration of the defendant's character by sentencing a defendant with the objective of restoring the defendant to useful citizenship, an objective that is much broader than defendant's past conduct in committing the offense." (Internal quotation marks omitted.) *Id.* ¶ 118.

Justice Neville further observed that granting defendants release based on demonstrated rehabilitation allows them a greater opportunity to become productive members of society and restoring them to useful citizenship. *Id.* ¶¶ 118, 124.

¶ 49　As the majority did, Justice Neville also touched on these considerations in the context of parole, noting that "excessive sentences threaten to defeat the effectiveness of the parole system by making mandatory the incarceration of a prisoner long after effective rehabilitation has been accomplished." (Internal quotation marks omitted.) *Id.* ¶ 124 (citing *People v. Roddy*, 9 Ill. App. 3d 65, 66 (1972)).

¶ 50　In this case, we likewise find that Mr. Carrasquillo's excessive sentence threatens to defeat the effectiveness of the parole system by keeping him incarcerated long after he has been effectively rehabilitated. Although we recognize that Mr. Carrasquillo was eligible for parole after

serving 20 years of his sentence, he has been repeatedly denied parole more than 30 times. This is no coincidence. By entering an indeterminate sentence of 200 to 600 years, the sentencing judge was sending a message to the Board that Mr. Carrasquillo should not be granted parole even if he were eligible. See *Carrasquillo*, No. 1-78-621, slip order at 9 ("[T]he sentence imposed of 200 to 600 years clearly suggests to the parole board that the trial judge did not believe defendant should be paroled after the minimum period of incarceration."). This is an edict that the Board has evidently followed, repeatedly declining to grant Mr. Carrasquillo parole despite the fact that the Board recognized his extensive rehabilitative efforts and the fact that he has received only one disciplinary ticket in prison since 1999. At Mr. Carrasquillo's parole hearing on October 28, 2021,[4] one Board member noted that Mr. Carrasquillo had "years of transformation" in prison and implored the Board to consider his rehabilitation. Another Board member observed that Mr. Carrasquillo had done "a lot of incredible things in prison." At Mr. Carrasquillo's hearing before the Board on February 21, 2023, Thomas Breen, who was one of the former prosecutors in this case in 1976, stated that he was "astounded" that Mr. Carrasquillo had not been granted parole yet and that he did not know what else Mr. Carrasquillo could do to show the Board that he had been rehabilitated. Despite this evidence and testimony, the Board has repeatedly denied Mr. Carrasquillo parole because doing so would "deprecate the serious nature of the offense." At Mr. Carrasquillo's most recent parole review, he was denied parole by a vote of 8 to 1.[5]

---

[4]We note that we may take judicial notice of the minutes of the Board. See *People v. Johnson*, 2021 IL 125738, ¶ 54.

[5]The minutes from the Mr. Carrasquillo's most recent parole hearing on May 25, 2023, are available on the Board's website. See Ill. Prisoner Review Bd., *En Banc Minute Sheet* (May 25, 2023), https://prb.illinois.gov/content/dam/soi/en/web/prb/documents/en-banc-minutes/May%202023%20 En%20Banc%20Minutes.pdf [https://perma.cc/B3KH-KD9L].

¶ 51    *Miller* and its related cases hold that a State is not required to guarantee eventual freedom, but it "must provide 'some *meaningful* opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (Emphasis added.) *Miller*, 567 U.S. at 479 (quoting *Graham v. Florida*, 560 U.S. 48, 75 (2010)). It is clear that, although Mr. Carrasquillo has had the apparent opportunity for release, because of his sentence and the offense for which he was convicted, such opportunity will never be "meaningful" despite his demonstrated maturity and rehabilitation. Accordingly, we find that, under these circumstances, Mr. Carrasquillo's indeterminate sentence of 200 to 600 years is the functional equivalent of a life without parole sentence, and we find that the circuit court manifestly erred in denying his petition on the basis that Mr. Carrasquillo was eligible for parole.

¶ 52    *Miller's* Application to Mr. Carrasquillo's Circumstances

¶ 53    This, however, does not end our inquiry. As we explained in our previous opinion, because Mr. Carrasquillo is not a juvenile, he was required to show how the *Miller* decision applied to his specific facts and circumstances. See *Harris*, 2018 IL 121932, ¶ 46. We remanded this matter to give Mr. Carrasquillo an opportunity to do so. *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 110. In accordance with that mandate, Mr. Carrasquillo presented the report from Dr. Kavanaugh, testimony from his brother, Jesse, and his own testimony in an effort to show that he was mentally more like a juvenile than an adult at the time of the shooting in this case.

¶ 54    Although the circuit court did not make any specific findings on "how the evolving science on juvenile maturity and brain development *** applie[d] to [Mr. Carrasquillo's] specific facts and circumstances" (*Harris*, 2018 IL 121932, ¶ 46), it did comment on the evidence he presented. The court found Dr. Kavanaugh's report "quite compelling in its analysis as to the prevailing

scientific community's understanding of juvenile maturity and brain development, and, specifically as to petitioner's tragic upbringing and own immaturity at the time of the murder." The court noted that it was "curious" that the State offered nothing to rebut Dr. Kavanaugh's report, but it found that the report only became "dispositive" if the court determined that Mr. Carrasquillo's sentence lacked an opportunity for parole.

¶ 55    Thus, the circuit court's comments suggest that Dr. Kavanaugh's report was sufficient to satisfy Mr. Carrasquillo's burden under *Miller* to show that the sentencing protections provided by that case applied to him as a young adult offender. Like it did in the circuit court, the State offers nothing to rebut the evidence presented on this point in its brief before this court. Accordingly, Mr. Carrasquillo has shown that he was entitled to the same sentencing protections as juveniles, such that the sentencing court was required to consider his youth and its attendant characteristics in determining his sentence. *People v. Holman*, 2017 IL 120655, ¶¶ 46-47.

¶ 56    The record here shows that the sentencing judge did not consider these factors in determining Mr. Carrasquillo's sentence. As we noted in our previous appeal, the sentencing court could not have looked into a "crystal ball" and predicted the changing landscape of sentencing standards for youthful offenders. *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 92. Therefore, the appropriate remedy is to vacate Mr. Carrasquillo's sentence and to remand for a new sentencing hearing where the court can consider Mr. Carrasquillo's youth and its attendant characteristics in determining his sentence. *Buffer*, 2019 IL 122327, ¶ 47.

¶ 57    We reject, however, Mr. Carrasquillo's contention that the new sentencing hearing must take place before a new trial court judge. Mr. Carrasquillo asserts Judge Maldonado "failed to follow this Court's finding that Mr. Carrasquillo had no meaningful opportunity for parole" and

failed to reach the issue about how the evolving science of juvenile maturity applied to Mr. Carrasquillo's specific facts and circumstances. Mr. Carrasquillo maintains that a new sentencing hearing should be a "clean slate" that the fact finder should approach with an "open mind."

¶ 58 Although we recognize that we have the discretion to assign this matter to a new trial court judge on remand (see *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45), we find that such a remedy is not necessary here. As noted, the trial judge did not ignore this court's prior ruling with regard to whether Mr. Carrasquillo was eligible for parole, as those comments were made solely within the context of the cause-and-prejudice test for successive postconviction petitions and were not intended to be a mandate to the trial court. Furthermore, the trial judge in this case has not even remotely demonstrated any judicial bias or partiality that generally necessitates reassignment. See *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). Accordingly, we decline to reassign this case on remand.

¶ 59 Finally, because we find that remand is required pursuant to this court's jurisprudence under *Miller*, it is unnecessary for us to address Mr. Carrasquillo's alternative argument that his sentence violates the proportionate penalties clause because it "shocks the sense of our community."

¶ 60                                    III. CONCLUSION

¶ 61 For the reasons stated, we reverse the circuit court's order denying Mr. Carrasquillo's petition, vacate Mr. Carrasquillo's sentence, and remand to the circuit court to conduct a new sentencing hearing.

¶ 62    In light of one justice's impending retirement from the court, this court shortens the time to seek rehearing of this opinion to 10 days, rather than 21, from the issuance hereof pursuant to Illinois Supreme Court Rule 367(a) (eff. Nov. 1, 2017).

¶ 63    Reversed and remanded with directions.


¶ 64    JUSTICE NAVARRO, dissenting:

¶ 65    I respectfully disagree with the majority's holding in this case. In noting the standard of review, the majority states: " 'Following an evidentiary hearing where fact-finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous.' " *Supra* ¶ 34 (quoting *Beaman*, 229 Ill. 2d at 72). The trial court conducted an extensive evidentiary hearing in this cause, including testimony that addressed the parole hearings. I cannot agree that the court's ruling is an error nor that such error is "clearly evident, plain, and indisputable." *Ruiz*, 177 Ill. 2d at 384-85. As argued in the State's brief, there is a distinction between having been denied release and denied an opportunity for release. Mr. Carrasquillo should be given a meaningful opportunity for release. The record reflects that he has been given such an opportunity. In a 2019 review, a majority of the Board present at that time voted in favor of parole.

¶ 66    The trial court here determined that, although Mr. Carrasquillo had not been granted parole, he nonetheless had the opportunity for parole. There was no showing that he would never be granted parole. The majority opines that because of his sentence and the offense for which he was convicted he will never be granted parole. I disagree. Because I conclude that the trial court's ruling was not manifestly erroneous, I would affirm its denial of Mr. Carrasquillo's petition.

---

## *People v. Carrasquillo*, 2023 IL App (1st) 211241

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 76-C-005807; the Hon. Alfredo Maldonado, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Charles W. Hoffman, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, John E. Nowak, and Matthew Connors, Assistant State's Attorneys, of counsel), for the People. |

---