2024 IL App (1st) 220039-U

No. 1-22-0039

Filed May 16, 2024

Fourth Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 17 CR 7341 |
| | ) | |
| JAQUEL FOOTS, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Hoffman and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not abuse its discretion by allowing police officers to give lay opinion testimony identifying the defendant in surveillance video of a shooting based on their prior encounters with the defendant. Defendant failed to present sufficient evidence to demonstrate that he should be treated like a juvenile for sentencing purposes for a murder he committed at age 20.

¶ 2    Following a jury trial, Jaquel Foots was convicted of first degree murder and sentenced to 60 years' imprisonment. He appeals his conviction, arguing that police officers were improperly permitted to identify him in surveillance video. Foots also argues his sentence violates the Illinois Constitution's proportionate penalties clause, contending his 60-year term amounts to a *de facto*

life sentence, imposed without due consideration of his youth at the time of the offense. We affirm the conviction and sentence.

¶ 3                                                  I. BACKGROUND

¶ 4                          A. *Pretrial Hearing on Admissibility of Police Officer Identifications*

¶ 5          Foots was charged with first degree murder for fatally shooting Aressenial Allen[1] outside a convenience store on April 6, 2017. Before trial, Foots filed a motion *in limine* to bar police officers from identifying him in surveillance video from the shooting. The motion argued the officers' identifications were not probative, would not aid the jury, would encroach upon the function of the jury, and would be unfairly prejudicial. The State filed an opposing motion seeking to admit lay opinion testimony from Chicago Police Officers Eric Lovato, Ricardo Gallegos, and Matthew Birdsong, each identifying Foots as the shooter depicted in surveillance footage based on their prior encounters with him.

¶ 6          The court initially ruled that the State could introduce identification testimony from the officers subject to laying a proper foundation. However, just before the trial began and outside the presence of the jury, the court directed the State to present the officers' testimonies and gave the defense the opportunity to cross-examine them.

¶ 7          Officer Gallegos identified Foots in court and testified that he encountered Foots in 2016 during a street stop. On that occasion, he obtained Foots's name so he could issue Foots an investigatory stop receipt, which stated the reason for the stop. Subsequently, Officer Gallaegos observed Foots a "couple times" on the street while travelling to begin his assigned duties in the Fourth Police District. The day before Allen was killed, April 5, 2017, Officer Gallegos stopped a vehicle in which Foots was a passenger. Officer Gallegos was wearing a body-worn camera (BWC)

---

[1] Various spellings of the victim's first name appear in the record.

during the stop, and he reviewed the video prior to his testimony. During that stop, Foots stated his name and date of birth. Officer Gallegos viewed surveillance video depicting Allen's shooting. He recognized Foots in the video based on his prior encounters with him. On cross-examination, Officer Gallegos specified that when he observed Foots on the street, he was near the intersection of East 79th Street and South Escanaba Avenue (79th and Escanaba), which he knew was proximate to Foots's home address.

¶ 8        Officer Lovato, after identifying Foots in court, explained that he had a 30-minute interaction with Foots on March 10, 2016. In addition, Officer Lovato observed Foots hanging out on a street corner "several" times between the March 2016 incident and the 2017 shooting. Officer Lovato was also familiar with Foots's Instagram page after being directed to the page by another person based on an interest in amateur rap music. The Officer authenticated four photos from an Instagram account identifying Foots in each. Officer Lovato likewise recognized Foots in the surveillance footage of the shooting and testified that he appeared to wear the same clothing as in the Instagram photos. On cross-examination, Officer Lovato testified that the March 2016 encounter consisted of transport to a police station and processing of an arrest. He was unsure how long Foots was in his physical presence. Officer Lovato was also unsure how many times he had viewed Foots on the street but explained he was near the intersection of East 79th Street and South Exchange Avenue (a block from 79th and Escanaba) "almost every day."

¶ 9        Like the first two officers, Officer Birdsong identified Foots in court. He observed Foots "at least 15 or 20" times near 79th and Escanaba. Along with Officer Gallegos, Officer Birdsong conducted a traffic stop on April 5, 2017, in which Foots was a passenger in the stopped vehicle. Foots gave his name during the stop. On cross-examination, Officer Birdsong stated most of his

observations of Foots were made while driving by and he could not recall any face-to-face conversations with him.

¶ 10    Defense counsel argued that the officers' testimonies failed to demonstrate that they were more likely to correctly identify Foots from the surveillance video than jurors would. Among other things, she contended the described encounters lacked specificity and indicated little face-to-face interaction. She further argued that the identifications were prejudicial since they suggested Foots was involved in other crimes. The State countered that the identifications would assist the jury since the officers had numerous interactions with Foots and defense counsel's arguments went to weight, not admissibility. In addition, the prosecutor assured the court that the officers would not testify about arresting Foots or other crimes.

¶ 11    The court allowed the officer identifications, finding that they had established their familiarity with Foots and that their identifications were relevant and not unfairly prejudicial. However, the court ruled that either Officer Gallegos or Officer Birdsong, not both, could testify at trial since their testimony was essentially the same.

¶ 12                              B. *Trial*

¶ 13    Snow Ramsey testified that Allen was her boyfriend. He worked at a convenience store called Rock & Joe Foods located at East 83rd Street and South Crandon Avenue in Chicago. Allen opened and closed the store every day, working from 7 am to 8 pm. On April 6, 2017, Ramsey and Allen spoke via the FaceTime video application on their cell phones as Allen took a break around 3:20 in the afternoon. Allen was outside, smoking a cigarette. At some point, Allen lowered his phone and Ramsey perceived that he was not listening to her. Ramsey then heard a gunshot. The image Ramsey could see from Allen's phone was the sky. Ramsey said "hello." Allen did not respond.

¶ 14    Bradley Fairchild testified that he was 13 years old and attending seventh grade in April 2017.[2] As he often did after school, Fairchild walked to Rock & Joe Foods, located at East 83rd Street and South Crandon Avenue, on the afternoon of April 6. That day, he was accompanied by his friend, Donyae. As they approached the store, Fairchild observed Foots, whom he identified in court, talking to Allen, who Fairchild knew as Ace. Fairchild observed Foots move toward a car. Then, he heard Foots say, "I'm sick of this bulls***!" and observed Foots shoot Allen. Fairchild and Donyea then ran to a church across the street. Later that day, Fairchild went to the hospital due to ringing in his ears, which he attributed to his proximity to the gunshot. On April 15, Fairchild's father took him to a police station where he identified Foots in a lineup as the person who shot Allen. Fairchild also testified that he viewed the surveillance video from Rock & Joe Foods. The video was played for the jury. Fairchild said it accurately depicts the shooting he observed. On cross-examination, Fairchild testified that he saw a black handgun. He acknowledged that the shooter's sweatshirt hood was up.

¶ 15    Officer Birdsong identified Foots in court and testified that he was familiar with him from his patrols in the Fourth Police District. Specifically, he had 15 to 20 interactions with Foots, usually near the intersection of 79th and Escanaba. The day before Allen's shooting, Officer Birdsong interacted with Foots face-to-face. At that time, Foots gave his name and date of birth to Officer Birdsong's partner, Officer Gallegos. Officer Birdsong testified that he recognized Foots in the video from Rock & Joe Foods. As the video was played, Officer Birdsong pointed to the person he recognized as Foots. He further indicated that the video shows Foots wearing an Adidas jacket.

---

[2]Fairchild was age 17 at the time he testified at the 2021 trial.

¶ 16        On cross-examination, Officer Birdsong testified Foots was inside of a vehicle during a traffic stop when he encountered him on April 5, 2017. He did not recall Foots exiting the vehicle. Officer Birdsong further admitted that most of his observations of Foots occurred while passing by in a vehicle.

¶ 17        Officer Lovato identified Foots in court and testified that he encountered him for 30 minutes on March 10, 2016. In addition, he had often seen Foots on the street. Officer Lovato became familiar with Foots's Instagram account through neighborhood "want-to-be-rappers." He identified three photos from Instagram that included images of Foots standing beside other individuals. Like Officer Birdsong, Officer Lovato recognized Foots in the surveillance video and pointed him out. Officer Lovato stated that Foots appears to be wearing a similar jacket to the one he is seen wearing in the Instagram photos. Specifically, the jacket appeared the same color and bore the same Adidas insignia. On cross-examination, Officer Lovato admitted he was not continuously situated face-to-face with Foots during the 30-minute encounter in March 2016.

¶ 18        Detective Michael Demcak testified that he arrived at Rock & Joe Foods around 4:30 in the afternoon of April 6, 2017, in response to the reported shooting. At that location, he observed two expended shell casings, a black and silver earpiece, a black New York baseball hat, a cigarette, and blood. Detective Demcak identified photos of these items taken at the scene. He also retrieved video surveillance footage taken from the store's interior and exterior cameras that depicted the shooting. After Officer Lovato viewed the video, police began looking for Foots. Detective Demcak learned that Fairchild and Donyae were witnesses to the shooting. Donyea was shown a photo array that included a photo of Foots. Donyea did not identify the shooter in the array. Foots was arrested on the afternoon of April 7, 2017. He was released, according to Detective Demcak, because police did not believe they could complete their investigation within the 48 hours they

could hold him without being charged. Detective Demcak acknowledged on cross-examination that no firearm was recovered from the scene.

¶ 19    The parties stipulated that the medical examiner determined that Allen was killed by a gunshot wound to the left side of his head.

¶ 20    Foots elected not to testify and rested without presenting any evidence.

¶ 21    During the jury's deliberation, they sent a note to the court requesting to view Foots without his glasses or mask.[3] Over his objection, the court brought the jury into the courtroom and directed Foots to remove his glasses and mask. At a later point, the court had the video replayed in the courtroom for the jury since technical issues prevented the jury from being able to play the video in the deliberation room. Following their viewing of the video, the jury sent the court a note requesting to view the video among themselves with the ability to pause it. By agreement of the parties, the court allowed the jury to view the video in the courtroom with no one else present. Ultimately, the jury found Foots guilty of first degree murder and that he, during commission of the offense, personally discharged a firearm that proximately caused death.

¶ 22                                C. *Sentencing*

¶ 23    At sentencing, defense counsel noted that Foots was 20 years old at the time of the offense. She described his upbringing, noting that Foots was one of seven children and lived in a neighborhood colloquially known as Terror Town due to gang presence and frequent violence. Foots lacked a consistent positive adult male figure in his life. Both a supportive uncle and a stepfather were killed in violent acts. At age 15, a friend was killed while walking alongside Foots. The trauma he experienced, counsel posited, led Foots to fall in with the "wrong crowd" and self-

---

[3]Everyone in the courtroom during the trial wore a mask in accordance with procedures implemented due to the COVID-19 pandemic.

medicate with marijuana. Foots's mother kicked him out of the house because he had dropped out of high school. She was later killed in a fire caused by arson.

¶ 24    Defense counsel asked the court to consider that although legal adulthood begins at age 18, science has shown the brain's maturation continues into the 20s. Foots's brain, according to counsel, "is less developed, impulsive [and] less able to see the consequences of his actions." Thus, counsel argued that young adult offenders like Foots should be afforded the same limitations on lengthy sentences that apply for juveniles. Ultimately, counsel asked the court to impose the minimum sentence of 45 years, noting even the minimum is a *de facto* life sentence.

¶ 25    The court found the nature of the murder "quite aggravating." The court noted that video evidence showed Foots scouting the area before shooting Allen, leading the court to characterize the shooting as "an assassination." It was also aggravating, in the court's opinion, that Foots shot Allen with two children clearly present—Fairchild and Donyea. The court acknowledged the difficulties in Foots's upbringing but observed that Foots nevertheless had substantial family support, as shown by their attendance at his sentencing hearing. Regarding the age-related arguments put forth by defense counsel, the court stated:

> "He wasn't a child, He was 20 years old, and based on the experiences that you argued to me in mitigation he had to grow up fast. So I don't find that the sentence in this case is a sentence that would not be appropriate under the current law even based on [Foots's] age."

The court then sentenced Foots to a prison term of 35 years plus the mandatory 25-year enhancement based on the jury's finding that he personally discharged a firearm causing death.

¶ 26    Foots filed a motion to reconsider sentence, which the court denied. Foots then filed a timely notice of appeal.

¶ 27                                                    II. ANALYSIS

¶ 28                                      A. Lay Identification Testimony

¶ 29        On appeal, Foots first argues that the trial court erred by permitting police officers to identify him in surveillance video based on their prior encounters.

¶ 30        Lay opinion identification testimony is admissible under Illinois Rule of Evidence 701 if (a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue. *People v. Thompson*, 2016 IL 118667, ¶ 50. In *Thompson*, our supreme court explained:

> "[l]ay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury. A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required. Rather, the witness must only have had contact with the defendant, that the jury would not possess, to achieve a level of familiarity that renders the opinion helpful." *Id.*

¶ 31        However, such testimony may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* ¶ 54. Before the State may introduce lay opinion identification testimony from a law enforcement officer, the trial court must afford the defendant the opportunity to examine the officer outside the presence of the jury, as was done in this case. *Id.* ¶ 59. This precautionary procedure allows the trial court to make a more informed decision as to whether the testimony's probative value is substantially outweighed by the danger of unfair prejudice. *Id.*

¶ 32        When determining whether there is some basis for concluding that the witness is more likely to correctly identify the defendant, the trial court considers the totality of the circumstances,

including the following factors: (1) the witness's general familiarity with the defendant; (2) the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording; (3) whether the defendant was disguised in the recording or changed his or her appearance between the time of the recording and trial; and (4) the clarity of the recording and extent to which the individual is depicted. *Id.* ¶ 51. The absence of any single factor does not render the testimony inadmissible. *Id.*

¶ 33    Ultimately, the circuit court's decision to admit lay identification testimony is reviewed for an abuse of discretion. *Id.* ¶ 53. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Smith*, 2022 IL 127946, ¶ 25 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37).

¶ 34    Here, Foots argues the identification testimony should have been excluded because most of the officers' prior encounters with Foots were "fleeting glimpses" demonstrating only a "minimal-to-modest level of familiarity." While acknowledging that the officers testified to two longer encounters—the traffic stop the day before the shooting and Foots's arrest by Officer Lovato on March 10, 2016—he contends these failed to establish the officers' testimonies would be helpful to the jury.

¶ 35    As to Officer Birdsong's testimony, Foots contends the traffic stop was insufficient for the officer to achieve familiarity since Foots was a backseat passenger and Officer Birdsong's attention would have been on the driver. Additionally, it was Officer Gallegos, not Officer Birdsong, who spoke to Foots to obtain his name. This argument is speculative and contradicted by the record. Nothing in the pretrial testimony from Officers Gallegos or Birdsong, who both testified about the stop, supports that Officer Birdsong did not view Foots during the stop. To the contrary, his

testimony indicated that Officer Birdsong interacted with Foots during the stop, and he observed Foots when he gave Officer Gallegos his name.

¶ 36        Regarding Officer Lovato's testimony, Foots notes that the arrest occurred more than a year before the shooting and that the officer admitted he was not continually in Foots' presence. We disagree that these factors made Officer Lovato's identification testimony inadmissible. "[T]he extent of a witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility." *Thompson*, 2016 IL 118667, ¶ 53. In addition, Officer Lovato established the threshold criteria that his contact with Foots gave him a familiarity that the jury did not have, making his opinion helpful. Further, the traffic stop was close in time to the video in which Officer Birdsong identified Foots, likely less than 24 hours.

¶ 37        Apart from the arrest, Foots takes issue with Officer Lovato's identification based on Instagram photos, contending that the jury was just as capable of comparing the photos and surveillance video. This argument overlooks, however, that Officer Lovato's identification of Foots in the photos was essential to their admissibility. Absent his testimony, the Instagram photos would not have been in evidence for the jury to compare with the video.

¶ 38        Foots also complains that Officer Lovato testified that he appeared to wear the same Adidas jacket in the photos and video, again claiming the jury could make the comparison. Foots notes that officer Lovato never testified that he observed Foots wearing such a jacket in person and that Adidas jackets are not unique. We disagree that these factors made Officer Lovato's testimony inadmissible. A witness may establish their ability to identify a defendant in a video recording based on a similar manner of dress. *Id.* ¶ 51. The fact that Officer Lovato observed Foots wearing the Adidas jacket in Instagram photos instead of in person is of no moment. He was able to accurately identify Foots in the photos based on his general familiarity with Foots. In addition, a

witness may offer a lay opinion as to whether an individual is the same person in different photographs or videos so long as their opinion is rationally based on their perceptions of those items and their testimony helpful to the jury. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶¶ 76-79 (applying Rule 701 to find that witness was properly permitted to testify whether individuals shown in surveillance video and still photos were the same). Those conditions were met here. The fact that an Adidas jacket is not unique goes to the weight of Officer Lovato's testimony, not its admissibility.

¶ 39 Ultimately, we do not find that the trial court's decision to admit lay opinion identification testimony from the officers was arbitrary, fanciful, or unreasonable. We observe that the danger of unfair prejudice was reduced by the trial court's order limiting the State to presenting testimony from only one of the officers involved in the traffic stop. No abuse of discretion will be found where reasonable minds could differ about the admissibility of evidence. *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 28. Accordingly, we find that the trial court did not abuse its discretion.

¶ 40 Even if we were to find error in permitting the officers' identification testimony, we would find it harmless. Erroneous decisions on the admission of evidence are subject to harmless error analysis. *People v. Mulsmani*, 2020 IL App (1st) 200635, ¶ 72. To determine whether an error was harmless, we consider whether (1) the error contributed to the defendant's conviction, (2) the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) the challenged evidence was duplicative or cumulative. *Id*. Here, the record supports that the jury did not rely on the officers' identifications of Foots, but rather were convinced beyond a reasonable doubt that he was the shooter by comparing the video with their own observation of Foots.[4] During deliberation, the jury requested to view Foots without his face mask and glasses. They also requested to rewatch

---

[4] We viewed the videos submitted into evidence and note that the shooter's face is clearly visible in surveillance video from the store's interior just prior to the shooting.

the video with the ability to pause it. These procedures indicate the jury relied on what they viewed with their own eyes and not what they heard from the officers.

¶ 41                                                B. Sentencing

¶ 42        Foots next argues that his aggregate 60-year sentence of imprisonment violates the proportionate penalties clause of the Illinois Constitution as applied to him due to his youth and childhood trauma. He relies on Illinois case law stemming from *Miller v. Alabama*, 567 U.S. 460 (2012), which held that the eighth amendment to the United States Constitution prohibits a juvenile offender from being sentenced to a mandatory term of life without the possibility of parole. Our supreme court extended *Miller* to bar lengthy prison terms for juveniles that amount to the functional equivalent of life without the possibility of parole, termed *de facto* life. *People v. Reyes*, 2016 IL 119271, ¶ 9. Later, the court held that a sentence without an opportunity for release before serving 40 years imposed on a juvenile offender constitutes *de facto* life imprisonment. See *People v. Buffer*, 2019 IL 122327, ¶ 40 (establishing a prison term of more than 40 years as marking a *de facto* life sentence).

¶ 43        Although Foots was not a juvenile at the time of his offense, he contends the 40-year rule should extend to young adults like him through application of the proportionate penalties clause, which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. He further contends that he raised this issue at sentencing and sufficiently developed the record to demonstrate an as-applied challenge to his sentence. For relief, he requests that we either reduce his sentence to no more than 40 years or remand for a new sentencing hearing.

¶ 44        We find that Foots failed to demonstrate that the *Miller* principles should be applied to him as a young adult. *Miller*'s eighth amendment protections do not apply to adults, even young adults.

*People v. Harris*, 2018 IL121932, ¶ 61. However, our supreme court has contemplated that the proportionate penalties clause may permit a young adult offender to assert an as-applied challenge to show "how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to [their] specific facts and circumstances." *Id*. ¶ 46. But basic information about a defendant, like that found in a presentence investigation report, is insufficient to demonstrate that a young adult defendant should be treated like a juvenile for purposes of sentencing. *Id*. At sentencing in this case, Foots merely presented his age and basic information from his presentence investigation report. Thus, he failed to make the necessary showing contemplated by our supreme court for an as-applied proportionate penalties challenge to his sentence. *Cf. People v. Carrasquillo*, 2023 IL App (1st) 211241, ¶¶ 9-10 (similar claim supported by unrebutted testimony from a forensic psychologist opining that the defendant's brain maturation at age 18 was "less mature than his typical same age peers").

¶ 45    We note that the parties dispute whether Foots is subject to a *de facto* life sentence since he is eligible for parole. See 730 ILCS 5/5-4.5-115 (West 2020). Having found that Foots failed to present sufficient evidence to establish that the prohibition on *de facto* life sentences for juveniles should be extended to him as a young adult, we need not reach this issue.

¶ 46                    III. CONCLUSION

¶ 47    Based on the foregoing, we affirm the judgment of the circuit court.

¶ 48    Affirmed.